LOU LEVY AND CLAIRE L. LEVY, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 58159. Filed September 30, 1958.

*Bernard Weiss, Esq.*, and *Sidney Gelfand, Esq.*, for the petitioners. *Colin C. MacDonald, Jr., Esq.*, for the respondent.

Respondent determined a deficiency in petitioners' income tax for the year 1951 in the amount of $25,049.82. By an amendment to their petition, petitioners claim an overpayment of income tax for the same year in the amount of "approximately $3,500."

The principal question is whether certain payments made by a corporation to and for a stockholder-employee are taxable as dividends to that employee. Also in issue is whether certain expenditures gave rise to allowable deductions.

FINDINGS OF FACT.

Some of the facts were stipulated and are incorporated herein by this reference.

Petitioners, Lou Levy and Claire L. Levy, are husband and wife. They reside at 2 Gracie Square, New York, New York, and filed a joint income tax return for the calendar year 1951 with the then collector of internal revenue for the third district of New York. Claire L. Levy was not connected with the events relevant to this proceeding, and it is Lou Levy who will be referred to sometimes hereinafter as petitioner.

During 1937 petitioner became acquainted with three sisters named Maxene, Patricia, and LaVerne Andrews. The sisters were vocalists; they sang as a trio, and were known professionally as the "Andrews Sisters." By an agreement dated December 7, 1937, signed by petitioner, the Andrews sisters, and the parents of the sisters (two of the three sisters were then minors), petitioner became "personal representative and business manager" for the sisters. Paragraph numbered 6 of the agreement provided:

6. For all of his services rendered hereunder, in lieu of salary, the ARTISTS and the PARENTS agree to pay to the REPRESENTATIVE a sum equal to Twenty-five (25%) percent of any and all monies earned by the ARTISTS up to One Thousand ($1000.00) Dollars per week, and thirty percent (30%) on any sums earned by the ARTISTS in excess of such amount. It is understood that the aforesaid earnings shall refer to the collective earnings of the ARTISTS. Such sums shall be due and payable to the REPRESENTATIVE as and when the ARTISTS receive payment for their services. In connection with the foregoing, it is further understood and agreed that in the event the ARTISTS shall at the expiration of this contract, or any renewal thereof, be engaged in the fulfillment

of any engagement or other professional work negotiated or procured before said expiration, that the REPRESENTATIVE shall receive the said compensation until the conclusion of such engagement.

Between 1937 and 1944 petitioner married Maxene Andrews. Toward the end of 1944 petitioner and the Andrews sisters formed a partnership called the "Andrews Sisters Eight To The Bar Ranch." The four were equal partners in the partnership. The Andrews sisters were the sole source of the partnership income, and all of their income went into it. The partnership superseded the 1937 agreement.

On April 24, 1943, the Andrews sisters entered into an agreement with Decca Records, Inc. (hereinafter called Decca), by the terms of which the sisters agreed to record exclusively for Decca for the next 5 years. Decca agreed to pay the sisters specified royalties with respect to records sold, and also a percentage of the revenues received from radio broadcasting or other public performances involving the use of such records.

On January 7, 1946, the Andrews Sisters Eight To The Bar Ranch, Inc. (hereinafter referred to as the corporation), was organized under the laws of California with a capital of $5,000. The corporation issued 25 shares of $50-par-value stock to each of the Andrews sisters and to petitioner. They owned all of the corporation's outstanding stock. The officers of the corporation were: President, Lou Levy; vice president, Patricia Andrews; treasurer, LaVerne Andrews; secretary, Maxene Andrews.

The corporation was designed to replace the partnership formed in 1944.

On November 14, 1946, petitioner, the Andrews sisters and the corporation entered into an agreement concerning the above-mentioned contract of 1943 with Decca. The agreement provided in part as follows:

*AGREEMENT OF PURCHASE AND SALE*

\*　　\*　　\*　　.\*　　\*　　\*　　\*

c) The Andrews Sisters and Lou Levy do now desire to sell to the Corporation and Corporation desires to buy from them all rights in and under said contract with Decca Records, Inc., whereby royalties will hereafter be paid to the Andrews Sisters based upon sales made after January 1st, 1946, of recordings made prior thereto by the Andrews Sisters.

Now, THEREFORE, it is agreed as follows:

1) The Andrews Sisters and Lou Levy do jointly and severally bargain, sell, assign, transfer and set over to Corporation all of their right, title and interest in and to royalties otherwise accruing to the Andrews Sisters from Decca Records, Inc., based upon the contract of _____, between Decca Records, Inc. and the Andrews Sisters limited, however, to those royalties that shall have accrued and will hereafter accrue from and after January 1st, 1946, based upon the sales after January 1st, 1946 of recordings made by the Andrews Sisters for Decca Records, Inc. prior to January 1st, 1946.

2) In consideration of the sale, transfer and assignment hereinabove made

and the rights to receive royalties therein granted, Corporation agrees to pay to the Andrews Sisters and Lou Levy the total sum of Two Hundred Thousand Dollars ($200,000.00), of which one-fourth thereof shall be deemed to be payment to each of the three Andrews Sisters and one-fourth thereof to Lou Levy. Such sum of Two Hundred Thousand Dollars ($200,000.00) shall be paid in the following manner, to-wit: Forty Thousand Dollars ($40,000.00) thereof on or before _____, and One Hundred Sixty Thousand Dollars ($160,000.00) thereof in four (4) successive payments of $40,000.00 each at one year intervals commencing one (1) year after the initial payment. Such payments may be made in the form of equal individual remittances to each of the three Andrews Sisters and to Lou Levy, but the making of such individual payments and/or remittances if that shall be done shall be deemed to fully discharge the obligation of Corporation to make the payments as herein provided to the Andrews Sisters and to Lou Levy jointly.

3) The Andrews Sisters and Lou Levy do jointly and severally represent and warrant that they have full right and authority to enter into this agreement and to sell to Corporation the right to receive royalties as herein provided for. They do further represent and warrant that said contract with Decca Records, Inc. is still in full force and effect and that neither they nor any of them nor Decca Records, Inc. have taken or have threatened to take or do now contemplate the taking of any action which will or might adversely affect, diminish or impair the rights herein granted or agreed to be granted to Corporation in and to the specified royalties accruing under and pursuant to said agreement with Decca Records, Inc.

4) The Andrews Sisters and Lou Levy agree that they will obtain from Decca Records, Inc. a consent to the partial assignment of royalties as is herein provided for and agreed upon and will obtain from said Decca Records, Inc. an agreement to make payment of the royalties as are herein affected directly to Corporation.

5) It is mutually understood and agreed that this contract reflects the oral agreement of the parties entered into as of January 1st, 1946, and shall be deemed to have taken effect as of that date, without regard to the actual date of the execution hereof.

The minute books of the corporation do not contain a reference to this agreement, and the books of the corporation did not contain an entry concerning it until November 30, 1951. At the time the agreement was signed the books and records of the corporation were attended to by a certified public accountant.

Each Andrews sister entered into a contract titled "Employment Agreement" with the corporation. The contracts are dated November 14, 1946, and provide in part as follows:

a) The Corporation, among its other activities, is engaged in the business of producing or of causing to be produced motion pictures, radio and television programs, recordings and of arranging for or producing, or both, stage presentations and personal appearance tours of prominent artists, and for those purposes desires to place under contract to it persons capable both of assisting in such presentations and productions and of personally rendering their services as artists therein or in connection therewith and of obtaining from such persons miscellaneous services on behalf of the corporation connected with the conduct and management of and advice with respect to its general business affairs.

b) Artist has been engaged for many years and rendered her services in the entertainment industry including without limitation radio, recordings, motion

pictures, personal appearance tours and stage and theatrical presentations but is willing to enter the exclusive employ of corporation and to assign to it all contracts which she may have hitherto entered into for the rendition of any such services.

c) Corporation and Artist did hitherto, to-wit: on or about January 1st, 1946, enter into an oral agreement for the exclusive employment by corporation of Artist on all the terms and conditions which are contained in this written agreement, and it is the mutual desire of Corporation and Artist to reduce such oral agreement to writing as herein contained.

Now, THEREFORE, it is agreed as follows:

1) Corporation employs Artist to render to the Corporation the services hereinafter described and the Artist accepts such employment.

The original term of this agreement shall be deemed to have commenced on January 1st, 1946 and shall continue thereafter for a period of seven (7) years, to-wit, through December 31st, 1952.

2) Corporation will pay to Artist as full compensation for all services rendered and agreed to be rendered hereunder and for all rights granted and agreed to be granted pursuant to the terms hereof the sum of $500.00 per week for each week of the term hereof. Such compensation shall be paid only on condition that Artist keeps and performs each and every covenant and condition of this agreement to be kept or performed by her and shall be payment not only for the services of the Artist but also for the keeping and performing of such covenants and conditions and for all rights granted and agreed to be granted by the Artist to the Corporation hereunder. Such compensation shall be payable weekly at the office of the Corporation pursuant to the rules and regulations established by the Corporation for the payment of compensation. Artist shall not be entitled to compensation in addition to the foregoing for rendering her services at nights or on Sundays or holidays.

\* \* \* \* \* \* \*

6) The Artist grants the following rights solely and exclusively to the Corporation during the term hereof: to photograph or otherwise reproduce all of her performances for the Corporation; to record her voice and other sound effects in connection with the production of motion pictures; to record her voice and other sound effects by making electrical transcriptions or by any other method now known or unknown for the purpose of broadcasting such voice or other sound effects, or of manufacturing, distributing or selling to the public records thereof; and to transmit her performances and recordations of her voice and sound effects by wire, wireless, radio, television or by any other means now known or unknown.

The Artist grants to the Corporation exclusively and perpetually all rights of every kind and character whatsoever in and to all of her performances pursuant to this agreement, and in and to all recordations made of her voice and other sound effects pursuant to this agreement, including the right to produce, reproduce, transmit, exhibit and exploit the same by any method now known or unknown, and also the perpetual right to use her name and pictures and other reproductions of her physical likeness and recordations and reproductions of her voice and other sound effects in connection with any motion pictures, radio program recordings and transcriptions, and records in connection with the production of which corporation has utilized the services of Artist, and in connection with the advertising and exploitation of the foregoing.

\* \* \* \* \* \* \*

13) Subject to the contracts and commitments hereinafter referred to, the Artist represents, warrants and agrees that she is free to enter into this agree-

ment and that she is not subject to any obligations or disability which will or might prevent her from, or interfere with her in, fully keeping and performing all the covenants and conditions to be kept or performed by her hereunder, and also that she has not made, and will not make, any grant or assignment which will or might conflict with or impair the complete enjoyment of the rights and privileges granted to the Corporation hereunder.

The Artist agrees to assign to the corporation all existing contracts, agreements and commitments for the rendition of her services of any nature and for any person, firm or corporation whatsoever for the period coincident with the terms of this agreement and agrees to cause to be obtained from such persons, firms or corporation their respective consents to and approval of such assignments. All receipts, revenues and proceeds from and under any such agreements, contracts or commitments accruing during the term of this agreement should belong to and be the sole property of Corporation, and Artist shall direct such receipts, revenues and payments to be made and paid over directly to Corporation.

Between January 7, 1946, and March 15, 1947, royalties accrued under the agreement of April 1943 with Decca and payments thereof were made to the Andrews sisters by Decca. The Andrews sisters turned over these payments or portions thereof to the corporation.

On March 15, 1947, the Andrews sisters signed a document containing the following provisions:

### ASSIGNMENT

KNOW ALL MEN BY THESE PRESENTS:

That we, PATTY ANDREWS, MAXENE ANDREWS and LA VERNE ANDREWS, known professionally as the Andrews Sisters, individually and as a group, for and in consideration of the sum of ONE DOLLAR ($1.00) and other good and valuable consideration paid to us by and received from the ANDREWS SISTERS EIGHT TO THE BAR RANCH, INC., a California corporation, do by this instrument sell, convey, transfer, assign and set over unto the said Andrews Sisters Eight To The Bar Ranch, Inc., all of our right, title and interest of, in and to all of the income, royalties and proceeds to be derived by us, individually and as a group, under a contract dated April 24, 1943, made and entered into by and between Patty Andrews, Maxene Andrews and La Verne Andrews and Decca Records, Inc., for the rendering of our services as singers and performers in connection with certain recordings and transcriptions by us, made and to be made during the term of said contract.

To have and to hold the said contract unto the said Andrews Sisters Eight To The Bar Ranch, Inc., its successors and assigns, subject to all of the terms, covenants and conditions mentioned in said contract between us individually and as a group and Decca Records, Inc.

And we hereby, individually and as a group, authorize and empower the said Andrews Sisters Eight To The Bar Ranch, Inc., to demand and receive of the said Decca Records, Inc., all of the moneys, income and royalties due and to become due to us under the aforesaid agreement and contract between us, entered into on the 24th day of April, 1943, as above set forth.

The acceptance of the assignment on behalf of the corporation is reflected in its minute book. Decca was given notice of the above assignment and subsequently all royalties due the Andrews sisters

under the agreement of April 24, 1943, were paid by Decca directly to the corporation.

Decca and the corporation entered into an agreement dated December 14, 1948, which provided in part as follows:

1. Ranch agrees to furnish and Decca agrees to engage the exclusive personal services of La Verne Andrews, Maxene Andrews and Patty Andrews, known as the ANDREWS SISTERS (hereinafter called the "Artists"), in connection with the production of sound records for Decca. Ranch agrees that it will obtain from the Artists and deliver to Decca a letter, copy of contract, or acknowledgment, that the Artists are familiar with the provisions of this contract and that they agree to be bound thereby.

2. The term of this agreement shall be for a period of six years from January 2, 1949, during which time the Artists agree to record and Decca will accept commercially satisfactory masters of as many selections as Decca may desire, but not less than 120 record sides during the term of this agreement. * * *

\*     \*     \*     \*     \*     \*     \*

6. Decca will pay to Ranch for the rights granted herein except as is hereinafter set forth and for the services to be rendered hereunder (a) the following royalties on records sold less returns throughout the world by Decca or its licensees:

\*     \*     \*     \*     \*     \*     \*

(b) Decca will advance to Ranch the sum of $350,000.00 during the term of this agreement payable $50,000.00 on January 2, 1949, and $300,000.00 in equal instalments of $1,000.00 each week commencing with January 7, 1949, until the sum of $300,000.00 shall have been paid, such instalments of such advance payments made by Decca shall be applied against and deducted from the Artists' royalties hereinbefore provided; (c) Decca shall retain all royalties hereunder until the same shall aggregate $350,000.00, the amount of the advances Decca has obligated itself to pay as aforesaid. If, as, and when the royalties aggregate $350,000.00, the excess over such sum shall be paid to the Artists within 45 days after the expiration of each calendar half year; (d) if, Decca, in its discretion, shall license or permit the radio broadcast or other public performance of said records, Decca agrees to pay Ranch 50% of the net sums allocable to any selection embodied in such record which it may receive for the radio broadcast or other public performance thereof, after all expenses of licensing such radio broadcast or other public performance shall have been deducted therefrom.

\*     \*     \*     \*     \*     \*     \*

12. Ranch agrees that the Artists and Decca hereby release each other from further performance of the terms and obligations of all previous agreements between them, except as herein provided, and Ranch agrees that Decca may manufacture, use and sell under this agreement all recordings heretofore made by the Artists under said agreements at the rates provided under said agreements.

The books of the corporation were kept on the basis of a fiscal year ending November 30. The royalties from all recordings received by the corporation from Decca and the Andrews sisters follow:

| Year ended November 30 | Amount |
| --- | --- |
| 1946 | $82,363.83 |
| 1947 | 104,511.63 |
| 1948 | 119,400.23 |
| 1949 | 130,002.69 |
| 1950 | 54,000.00 |
| 1951 | 48,666.67 |

Included in the foregoing royalties for the 5-year period ending November 30, 1950, were royalties in the aggregate amount of $190,047.82 paid with respect to recordings made prior to January 1, 1946.

Included in the royalties of $82,363.83 reported by the corporation in the year ended November 30, 1946, were royalties on record sales in the United States for a period up to December 31, 1945, a period prior to the formation of the corporation, aggregating $20,842.80; and royalties on foreign sales of records for the period July 1, 1938, to March 31, 1946, of $23,913.83. These royalties were received on recordings made prior to January 1, 1946. The amount of foreign royalties on records sold in the period January 1, 1946, to March 31, 1946, included in the $23,913.83 was between $1,000 and $2,000.

On November 30, 1950, the books of the corporation reflected an earned surplus exclusive of capital of $102,968.81 as of the close of the fiscal year ending November 30, 1950. On line 16, page 4, of the corporation's income tax return for that fiscal year (Form 1120) the figure $102,968.81 is set forth as the total "Earned surplus and undivided profits."

Divorce proceedings to terminate the marriage of petitioner and Maxene Andrews were initiated in 1949. The divorce became final in 1950. Petitioner married again on August 31, 1951. The corporation dismissed petitioner as an employee toward the end of that year.

Petitioner, prior to his dismissal, had an employment contract with the corporation under the terms of which he was to have been paid $500 per week. Petitioner reported total wages from the corporation of $20,075.50 for the calendar year 1951.

Entries in an account concerning petitioner on the books of the corporation for the corporation's fiscal year ending November 30, 1951, follow:

| | | |
|---|---|---|
| Balance | | $35,120.82 |
| 12/21/1950 | Cash received | (8,000.00) |
| 1/15/1951 | Check to Collector of Int. Revenue | 1,500.00 |
| 1/19 " " " Richard Flowers | | 144.20 |
| 3/6 " " " Conn. Mutual Life Ins | | 165.77 |
| 3/9 " " " Collector of Int. Revenue | | 1,500.00 |
| 4/9 " " " " " " " | | 1,000.00 |
| " " " " Lou Levy | | 3,500.00 |
| 5/9 " " " " " | | 25,000.00 |
| 6/27 " " " Collector of Int. Revenue | | 1,000.00 |
| " " " " Lou Levy | | 375.60 |
| " " Withheld from Lou Levy salary 4 at 343.90 | | (1,375.60) |
| Cancel check of 3/6/51 | | (165.77) |
| Reverse entry of 11/30/50 | | 8,000.00 |
| Record payments from insurance acct | | 1,224.55 |
| Charge Lou Levy for expenses reimburs. not allowed | | [1] 6,224.84 |
| Charge for personal expenses—Paris trip | | 185.71 |
| | | $75,400.12 |

[1] (1948 year.)

These entries reflect actual payments to or on behalf of petitioner, none of which is reported in petitioners' income tax return for the year 1951. No agreement with the corporation concerning repayment, interest or security, in connection with these payments was ever entered into.

Ollie and Peter Andrews were the parents of the Andrews sisters. Ollie Andrews died in 1948 and Peter Andrews died in 1949. La Verne Andrews was appointed administratrix of Ollie Andrews' estate on March 7, 1950, and executrix of Peter Andrews' estate on April 25, 1950.

During 1952 or 1953, in the course of litigation between the Andrews sisters and petitioner, he examined for the first time the books and records of the corporation concerning the years 1951 or 1952 and learned that they indicated a prior indebtedness of Ollie and Peter Andrews to the corporation in an amount between $29,000 and $31,000.

The corporation's income tax returns for the years ending November 30, 1951, and thereafter were not prepared by the same accountant who prepared the returns for the years prior thereto.

The following information is taken from the corporation's income tax returns:

| | Year ending Nov. 30 | | |
| Notes receivable: | 1950 | 1951 | 1952 |
|---|---|---|---|
| Start of year | 0 | 157,522.43 | 120,330.26 |
| End of year | 0 | 120,330.26 | 76,845.85 |
| Accounts receivable: | | | |
| Start of year | 0 | 99,083.53 | 142,577.56 |
| End of year | 0 | 142,577.56 | 96,883.56 |

Attached to the income tax return for the taxable year ending November 30, 1952, are a profit and loss statement, a balance sheet and a reconciliation of surplus. Under the last named heading there are the following item and explanation: "Write off of account receivable from Estate of Peter and Ollie Andrews barred by statute of limitations in prior year—(29,217.65)."

On November 30, 1951, the newly hired accounting firm made the following journal entry in the corporation's books:

Nov. 30, 1951 Cost of Decca Contract Purchased $200,000.

| Contracts Payable—Lou Levy | $50,000. |
|---|---|
| Maxene Andrews | 50,000. |
| LaVerne Andrews | 50,000. |
| Patty Andrews | 50,000. |

On the balance sheets which are part of the corporation's income tax returns the following accounts, among others, contain balances:

| Year ending | Accounts |
|---|---|
| November 30, 1946 | { Loans receivable<br>Taxes payable |

| Year ending | Accounts |
|---|---|
| November 30, 1947 | Loans receivable<br>Deposits and claims receivable<br>Accounts payable<br>Accrued taxes<br>Loans payable |
| November 30, 1948 | Loans receivable<br>Deposit and claim receivable<br>Accrued taxes<br>Accrued expenses<br>Accrued salaries<br>Loan payable |
| November 30, 1949 | Loans receivable<br>Deposits and claims receivable<br>Accounts payable<br>Accrued taxes<br>Accrued expenses<br>Accrued salaries<br>Loan payable |
| November 30, 1950 | Loans receivable<br>Deposits and claims<br>Accounts payable<br>Accrued taxes |
| November 30, 1951 | Accounts receivable<br>Notes receivable<br>Prepaid rent<br>Deferred television picture expense<br>Loans payable<br>Contract payable<br>Accrued taxes |
| November 30, 1952 | Accounts receivable<br>Notes receivable<br>Loans payable<br>Accounts payable<br>Contract payable<br>Accrued taxes |

The corporation had earnings and profits of $6,441.08 in its taxable year ending November 30, 1951.

The Federal income tax and excess profits tax returns of the corporation for the fiscal years ended November 30, 1946, through November 30, 1950, inclusive, were audited by the Internal Revenue Service in 1952. As a result, it was determined that the corporation was subject to personal holding company surtax for the fiscal years 1949 and 1950, and final deficiencies were determined for the following years in the following amounts:

| Year ended November 30 | Income tax | Personal holding company surtax |
|---|---|---|
| 1946 | [1]($1, 170. 59) | |
| 1949 | 4, 550. 43 | $16, 826. 21 |
| 1950 | 6, 463. 71 | 46, 502. 69 |
| Total | 9, 843. 55 | 63, 328. 90 |

[1] Overassessment.

The above deficiencies have been subject to a final closing agreement executed in 1953.

The parties have stipulated that in the determination of the foregoing deficiencies, "amortization of the Decca Records contract claimed in the amount of $196,666.67" by the corporation was "disallowed to the extent of $166,068.53."

The Federal income tax return of the corporation for the fiscal year ended November 30, 1951, was audited by the Internal Revenue Service which determined an overassessment in income tax (Korean War excess profits tax) of $10,429.58 and a deficiency in personal holding company surtax of $38,586.06, which latter amount has been assessed.

In computing the income tax and personal holding company surtax deficiencies of the corporation for the fiscal years ended November 30, 1949, 1950, and 1951, the amounts charged to the account of Lou Levy on the books of the corporation were neither claimed nor allowed as expenses or distributions.

On August 12, 1954, the district director of internal revenue, Los Angeles, California, served a levy and notice of Federal tax lien on Lou Levy in connection with the deficiencies assessed against the corporation.

During the year 1951 petitioner, in addition to his employment by the corporation, worked as an "artists' representative" for performers other than the Andrews sisters, and managed the Leeds Music Corporation. As an "artists' representative" petitioner attempted to improve the abilities and earnings of those he represented. Petitioner's office was in New York City, but in the course of his duties it was often necessary for him to travel. When in New York City petitioner gave advice concerning business problems to those he represented.

In connection with his work as an "artists' representative" petitioner retained the services of Bernard L. Millar—an attorney. In 1951 petitioner gave this attorney a check dated May 17, 1951, in the amount of $2,500. This check was in payment for services rendered by the attorney, while petitioner was absent from New York City, for artists retaining petitioner. The amount of this check was not claimed as a deduction on petitioners' income tax return, but in an amendment to their petition it is claimed as a "deduction for business legal expenses."

During 1951 petitioner gave 28 checks totaling $3,300 to a vocalist known professionally as Bob Houston (hereinafter referred to as Houston). Also during that year petitioner gave one check in the amount of $300 to Houston's wife. At that time petitioner believed that Houston would become a "star." The checks were to be used by Houston for his living expenses, and for lessons to develop his talents. Petitioner and Houston had no arrangement whereby the latter

would repay the former. Houston did not become a "star," and no part of the $3,600 has ever been repaid petitioner.

Petitioners did not claim the $3,600 as a deduction on their income tax return, but in an amendment to their petition they claim a deduction in that amount for "loss sustained on talent development," and claim, further, that petitioners are "entitled to a deduction of $3,- 600.00" in this connection.

Toward the end of 1950 or during the early part of 1951 the Andrews sisters wanted petitioner to get them roles in a motion picture. Petitioner was unable to obtain such employment for the Andrews sisters from the motion picture studios. At this time there was some danger that the Andrews sisters would lose their faith in petitioner as a business manager. Petitioner thought he could get the Andrews sisters suitable motion picture employment if he could purchase a script and employ a producer, and then attempt to sell a "package" to a motion picture studio.

In accordance with the above plan petitioner, on March 6, 1951, paid a total of $2,000 to Alex Gottlieb (hereinafter referred to as Gottlieb) and Francis Swann (hereinafter referred to as Swann) who in turn agreed to write a story outline for a possible motion picture. Petitioner was to pay an additional $8,000 to Gottlieb and Swann for a completed script if the outline met with his approval. The outline was written but it did not meet with petitioner's approval. The outline was returned to Gottlieb and Swann, and they kept the $2,000. All these events occurred in 1951.

Petitioners did not claim a deduction for the amount paid to Gottlieb and Swann on their income tax returns, but in an amendment to their petition claim it as a "deduction for a loss sustained on abandoned story rights."

OPINION.

RAUM, *Judge:* 1. *Corporate distributions to or on behalf of Lou Levy.*—The principal issue is whether payments in the net aggregate amount of $34,054.46 [1] appearing on the books of the corporation which were in fact made by it during 1951 to or on behalf of petitioner Lou Levy represent taxable dividends, as contended by the

---

[1] In the notice of deficiency the Commissioner added $40,279.30 to petitioners' taxable income, and explained the adjustment as follows: "Amounts drawn on open account during the taxable year which were never repaid are considered income at the time received." The $40,279.30 figure represents the difference between the balance of $75,400.12 in Lou Levy's account on the corporation's books as of November 30, 1951, and the balance of $35,120.80 in that account as of the close of the preceding fiscal year. The Government has since conceded that one of the components of the increased balance in 1951 was a $6,224.84 bookkeeping adjustment with respect to a prior year, which should be subtracted from the $40,279.30 previously added to income by the Commissioner. The resulting $34,054.46 now charged to petitioner represents the net aggregate amount of disbursements made by the corporation to petitioner or on his behalf during the calendar year 1951 and prior to the end of the corporation's fiscal year ending November 30, 1951. No part of that amount was reported by petitioners on their 1951 returns.

Government. The petitioner argues in substance that the payments reflected on the books were merely loans to him, and further that the corporation was indebted to him in the amount of $50,000 as a result of the November 14, 1946 "Agreement of Purchase and Sale," which more than offsets the amount in controversy. He also contends that the earnings and profits of the corporation were insufficient to support the alleged dividend, and that in any event the payments, if deemed taxable at all, are taxable only as capital gains.

We reject petitioner's contention that the payments in question were loans. The burden of proof was upon him, and the evidence presented was far from satisfactory. We are not convinced that there was any real intention or understanding that he would repay the amounts involved. There were no notes or other evidences of indebtedness; there was no proof of any agreements for repayment, either written or oral; no interest was either charged or paid; no security was given. These payments were in sharp contrast to a bona fide loan, disclosed by the evidence, which the corporation made to petitioner for his music publishing firm (Leeds Music Company), where interest was charged, security was given, and the corporation expected and received repayment. Although the present problem is in some degree complicated by litigation resulting from strained relations between Lou Levy and the Andrews sisters and by the apparently inconsistent position taken by the Government with respect to Lou Levy and the corporation, we are reasonably satisfied on this record that the disputed advances did not represent bona fide loans.

Nor do we agree with the contention that the 1951 payments must be offset against an alleged indebtedness in the amount of $50,000 running from the corporation to Lou Levy in connection with the November 14, 1946, "Agreement of Purchase and Sale." In the first place, there is no rule which forbids treating corporate distributions as dividends merely because the stockholder may also be a creditor of the corporation. The payments here in controversy do not appear to have any significant relation to the alleged 1946 indebtedness. Moreover, we are unable to find that there was in fact any such bona fide indebtedness.

Petitioners maintain that the contract dated November 14, 1946, between the corporation on the one hand and the Andrews sisters and Lou Levy on the other resulted in the purchase of the Decca contract of April 24, 1943, for $200,000, of which Lou Levy's share was $50,000. But that contract, which ran for 5 years from April 24, 1943, was merely between the Andrews sisters and Decca. Lou Levy was not a party to it, and, notwithstanding some conclusory testimony by him, we are not satisfied that either he or the partnership which preceded the corporation had any interest in it. His right, as man-

ager of the Andrews sisters, was to receive a percentage of their earnings, but this does not mean that he had any rights of ownership in the contract that he could sell. The alleged contract of sale of November 14, 1946, did not, in any event, relate to the entire Decca contract; it was limited to royalties and income with respect to recordings made prior to 1946. The November 14, 1946, contract does not appear to have been presented to Decca for its approval; it was not recorded on the corporation's books until some years later; and no payments of alleged sales price required thereunder appear to have been made. We are not convinced that there ever was a bona fide $50,000 indebtedness from the corporation to Lou Levy as contended by him.

We deal now with petitioners' contention that the corporation did not have sufficient earnings and profits to justify treating the $34,054.46 distributions as dividends. Under section 115 (a) of the Internal Revenue Code of 1939 a distribution qualifies as a dividend if it is made out of accumulated earnings or profits or out of current earnings or profits. And in the instant case the record shows and petitioners concede that the corporation had current earnings and profits in the amount of $6,441.08 for its fiscal year ending November 30, 1951. Accordingly, to that extent at least the Commissioner correctly treated the contested distributions as dividends. However, we agree with petitioners that the corporation did not have accumulated earnings or profits to support the remaining $27,613.38.

The starting point for the determination of the corporation's accumulated earnings and profits is a stipulation of the parties that the books of the corporation as of November 30, 1950, disclose "earned surplus" as of that date in the amount of $102,968.81. The same information appears on the corporation's return for that year. The parties have proceeded upon the assumption that this is the equivalent of "earnings or profits," and we do likewise for purposes of this case. However, petitioners contend that a number of adjustments must be made that more than wipe out this amount.

We need not pause to examine all of the adjustments, some of which appear to be doubtful at best, for we think that there is one required adjustment that eliminates the earnings and profits account completely. The evidence shows that after January 1, 1946, income was received from Decca in the amount of more than $190,000 with respect to recordings made by the Andrews sisters prior to 1946. Such income could not be effectively assigned so as to relieve the assignors of accountability therefor taxwise, cf. *Helvering* v. *Eubank*, 311 U. S. 122, and it should not have been included in the corporation's earnings. The elimination of this single item erases the accumulated earnings and profits of the corporation. We must conclude therefore

that the remaining $27,613.38 may not be treated as a dividend, but must be taxed as capital gain.[2]

2. *Payment of $2,500 to Bernard L. Millar.*—Respondent does not deny that this payment was made to Millar, an attorney, during 1951. However, he contends that petitioners have failed to prove that the expenditure was "incurred in the carrying on of the business of being an artists representative" or that it was an "ordinary expense and a necessary expense of said trade or business." We do not agree.

As an "artists' representative" Lou Levy was expected to give advice to artists on their business problems. This was a necessary part of his business. The evidence shows that he was frequently away from New York, and he arranged to have Millar perform this service while he was thus absent. For rendering this service Levy paid Millar $2,500. We are satisfied that this payment was an ordinary and necessary expense of Levy's business within the meaning of section 23 (a) (1) (A), I. R. C. 1939, and is deductible.

3. *Payments totaling $3,600 in connection with Bob Houston.*—During the taxable year Lou Levy made a series of payments aggregating $3,600 in an attempt to make a "star" out of a singer named Bob Houston. He expected to derive substantial fees as the "artist's representative," if he had succeeded. However, the project was a failure. The payments were not loans and have not in fact been repaid. Although Lou Levy was under no obligation to make these payments, nevertheless, considering the nature of his business, we think they were proximately related thereto and are deductible as ordinary and necessary expenses. Contrary to respondent's contention, we think the issue was adequately raised in petitioners' amendment to the petition.

4. *Payment of $2,000 to Gottlieb and Swann.*—This issue was first raised in an amendment to the petition. The relevant provisions of the amendment follow:

2. * * * 4 (d) Commissioner has erroneously failed to allow a deduction of $2,000.00 for a loss sustained on abandoned story rights.

\* \* \* \* \* \* \*

5. * * * 5 (1) On March 15, 1951, petitioner Lou Levy paid Alex Gottlieb $1,000.00 and Francis Swann $1,000.00 for a story outline of "G. I. Janes". Petitioner intended to produce a play based on said story outline but abandoned this project in 1951. Said loss of $2,000.00 is an allowable deduction which petitioners failed to claim on their return.

---

[2] Petitioners' brief states, "However, if the Court should find that the $34,054.46 received by Levy were not on account of loans or prior indebtedness, then petitioner contends said amounts are not taxable as ordinary dividends but as capital gain income since the Corporation had no accumulated earnings and profits." There is no showing on this record that Lou Levy had any unrecovered basis with respect to his stock, nor has any contention been made that any portion of the payments should be allocated to basis of the stock.

In his opening statement counsel for petitioners said "taxpayer claims he is entitled to deduct a loss incurred in connection with a story outline."

It would appear from what we have quoted above that petitioners were claiming a deduction based on a loss. However, on brief they contend that "the $2,000 paid to Gottlieb and Swann is an allowable deduction as a business expense under Section 23 (a) or as a loss under Section 23 (e) of the Internal Revenue Code of 1939." Respondent argues that petitioners' claim for an expense deduction cannot be entertained insofar as it was raised for the first time on brief and is not properly before us. We need not decide the question raised by respondent because we are convinced that the payment resulted in a loss deductible under section 23 (e) (1).

Lou Levy paid two writers, Gottlieb and Swann, $2,000 for certain rights in a story outline; that amount was to be part payment for a complete motion picture script if he should approve the outline. The story, "G. I. Janes," was intended as a vehicle for the Andrews sisters. However, the outline was not satisfactory, he gave up the idea of producing a motion picture based upon it, forfeited his rights to the outline and was not entitled to a refund of the $2,000. The entire project was abandoned during the taxable year. That he suffered a loss is clear.

The question remains whether the loss was incurred in petitioner's trade or business. Respondent maintains that Lou Levy was neither in the business of producing motion pictures nor in the business of creating "motion picture packages" for sale to the picture industry. However, he was in the business of being an "artist's representative" and the transaction concerning the story outline was part of that business.

Lou Levy's standing as an "artists' representative" was threatened by his strained relations with the Andrews sisters. It was necessary for him to attempt to get them motion picture work not only to protect his position with the corporation but to avoid events which would damage his reputation in the entertainment field. We are satisfied on the basis of the whole record that the $2,000 loss was incurred in his trade or business and is deductible.

*Decision will be entered under Rule 50.*