ESTATE OF LOUISE F. MARCELLO, DECEASED, CARLOS MARCELLO, ADMINISTRATOR, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Estate of Marcello v. Commissioner
Docket Nos. 3586-68, 3591-68, 2096-69, 2097-69, 2098-69, 2099-69, 1734-70.
United States Tax Court
T.C. Memo 1977-353; 1977 Tax Ct. Memo LEXIS 90; 36 T.C.M. (CCH) 1408; T.C.M. (RIA) 770353; October 3, 1977, Filed deQuincy V. Sutton[2] and Virgil M. Wheeler, Jr., for the petitioners. Bruce A. McArdle, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: These consolidated cases were assigned to and heard by former Special Trial Judge Joseph N. Ingolia. His report was filed on April 14, 1977. By Order dated May 25, 1977, the parties were given until August 29, 1977, to file exceptions to the report. No exceptions have been filed, and the report, with minor changes, is hereby adopted. Respondent determined the following Federal income taxes and additions to tax with respect to the petitioners: Additions to the Tax
Int. Rev. Code of 1954
Docket
Taxable
Income
Petitioner
Number
Year
Tax
Code §
Code §
6651(a)
6653(a)
Est. of Louise F.
Marcello, Dec'd.
3586-68
1964
$ 37,649.75
$1,882.49
Carlos and
Jacque-
line Marcello
3591-68
1964
264,556.28
$13,227.81
Carlos and
Jacque-
line Marcello
2099-69
1965
59,554.38
2,977.72
Jefferson D. II
and Louise
2096-69
1965
89,953.44
Hampton
William J. and
Florence Robards
2097-69
1965
89,743.04
Joseph C. and
Barbara Marcello
2098-69
1965
91,956.61
4,597.83
Joseph Marcello,
Jr. and Anastasia
Marcello
1734-70
1965
3,673.01
*92 Concessions have been made by the parties. The issues remaining for decision are as follows: 1. Whether amounts received by petitioners Estate of Louise F. Marcello and Carlos and Jacqueline Marcello from the sale of corporate stock are taxable as ordinary income or capital gains. 2. Whether legal expenses incurred in a bribery trial are deductible by Carlos and Jacqueline Marcello. 3. Whether stock held by petitioners Joseph C. and Barbara Marcello, Jefferson D. II and Louise Hampton, and William J. and Florence Robards, was given as compensation for services rendered as corporate officers. 4. Whether amounts advanced to petitioner Joseph Marcello, the sole shareholder of a corporation, are loans or constructive dividends taxable to the petitioners Joseph and Anastasia Marcello. 5. Whether the basis of petitioners Carlos and Jacqueline Marcello in certain real estate is subject to adjustment and reduction upon the cancellation and retirement of a mortgage note. 6. Whether Joseph C. and Barbara Marcello and Carlos and Jacqueline Marcello, are liable for negligence penalties. 7. Whether Louise F. Marcello's failure to file a timely return was due to reasonable *93 cause rather than willful neglect. Estate of Louise F. Marcello. Ordinary Income v. Capital Gain; Golino Payment. FINDINGS OF FACT Some of the facts have been stipulated and, together with the exhibits attached thereto, are so found and are incorporated by this reference. The petitioner, Louise F. Marcello, deceased (hereinafter sometimes referred to as "estate" or "Louise") was an individual whose legal residence was Metairie, Louisiana, at the time the petitions were filed in her case. The Federal income tax return of Louise for the taxable year 1964 was filed with the District Director of Internal Revenue at New Orleans, Louisiana. Joseph Marcello, Sr., Louise's husband, died in 1952. On or after July 1, 1955, a State court ordered that Louise be recognized as the owner of one-half of his property and as the holder of a usufruct interest (life estate) in the other one-half of such property. The court also ordered that each of the nine children of Joseph Marcello, Sr., be recognized as the owner of an undivided one-ninth interest in the property which was subject to Louise's life estate. Included in such property was a tract of approximately 183 acres of land *94 located in Jefferson Parish, Louisiana. In late 1958, such land was divided into parcels of 20,333 acres each. Nine new corporations were organized and were named: Gems, Inc.; Pearl Lands, Inc.; Amethyst Lands, Inc.; Emerald Lands, Inc.; Sapphire Lands, Inc.; Garnet Lands, Inc.; Topaz Lands, Inc.; Ruby Lands, Inc.; and Moonlight, Inc. These corporations are sometimes referred to herein as the "nine corporations." On December 26, 1958, each of the nine corporations purchased a 20.333-acre parcel of land from Louise and her children. The consideration for the transfer of each parcel was a promissory note for $111,111.11, payable in 10 annual installments and bearing interest at a rate of 6 percent per year. Each note was secured by a first mortgage and a vendor's lien against the particular parcel of land involved, and each was personally endorsed by James J. Culotta, a general contractor and president of the nine corporations, who owned one-half of the stock of the nine corporations. Joseph Connolly received the other one-half of the stock of the nine corporations in consideration for his promise to raise the necessary financing for the residential development of the nine parcels. *95 The acts or deeds of credit sale for each of the nine parcels were signed by Carlos Marcello, individually, and as agent for the other heirs of Joseph Marcello, Sr. The notes were in default with respect to the principal and interest from the date of the first payment. Carlos Marcello was a shareholder of a corporation called Jacqueline, Inc. (hereinafter referred to as "Jacqueline") which owned a motel in the western part of New Orleans known as Holiday Inn West. The shares of Jacqueline which were issued to Rosario and Frank Occhipinti (hereinafter referred to as the "Occhipintis") were beneficially owned one-half by the Occhipintis and one-half by Carlos Marcello. In 1959, the owners of Jacqueline decided to purchase The LeBaron Corporation (hereinafter referred to as "LeBaron") which operated a motel in the eastern part of New Orleans. LeBaron at this time was in receivership under the jurisdiction of the United States District Court for the Eastern District of Louisiana.The purchase price was $690,000 in cash. The owners of Jacqueline needed to raise $540,000 to make the purchase. They obtained a loan for this amount by pledging as security, among other collateral, *96 the nine unpaid promissory notes from the nine corporations. In 1964, Jacqueline, Motor Hotels of Louisiana, Inc., the corporation operating Holiday Inn West, and LeBaron were sold to Leon Poirier, Douglas Black, and Frank Olah (hereinafter referred to as the "Poirier group") for $950,000 in cash and notes, and assumed liabilities. The estate received $84,650. This amount was based on a 6 percent rate of interest on the collateral from Louise's estate which was used by LeBaron for a certain period of time. In addition, Carlos received $300,000; $200,000 from the sale proceeds and $100,000 pursuant to a separate agreement with Douglas Black. (The two documents which embody the agreement of the parties for this additional consideration are inconsistent and will be discussed later.) Finally, Felice Golino, a shareholder of Jacqueline, received $84,371.50. These amounts were determined at a meeting of Jacqueline's shareholders held in January of 1964 to discuss the Poirier group's offer of purchase. The stock of LeBaron was issued to the Occhipintis. The record is unclear with respect to other parties who may have owned some of the LeBaron Stock. The notice of acceptance of *97 the Poirier group's offer, dated January 27, 1964, stated that it was signed by all the shareholders of Jacqueline, Motor Hotels of Louisiana, Inc., and LeBaron. Both Carlos Marcello and Felice Golino also signed the notice of acceptance. The Estate of Louise F. Marcello was not listed as a shareholder. Another document which purports to be the written agreement of the distribution determined at the January meeting was signed by attorney deQuincy V. Sutton on behalf of the estate. On December 30, 1964, Felice Golino issued a check to the order of the estate for $15,000. The check bore two notations on its face: "Re: Sale of LeBaron Corp. & Holiday Inn Stock"; and "Re: Sale of 'Kims Desert Inn' and 'LeBaron Corp.' Stock." A single line ran through the latter notation as if to cancel it. Mr. Sidney Reiner, Felice Golino's accountant, made out the check at Mr. Golino's request, and wrote only the latter of the two notations. The check was in payment of a commission due on the sale of stock in the two motels. Carlos did not know why the latter notation appeared on the check since the transaction concerned only LeBaron and the Holiday Inn. He could not remember the circumstances *98 surrounding the $15,000 payment.Mr. Golino reported the $15,000 payment as a commission expense on his Federal income tax return for 1964. OPINION The respondent argues that the $84,650 paid to the Estate of Louise F. Marcello is ordinary income. The petitioners argue it is capital gain. The respondent predicates his argument on the assertion that the $84,650 represents interest paid to the estate for use of the nine promissory notes as security for acquisition of the $540,000 loan which was used to purchase LeBaron. The petitioners argue that the substance of the transaction rather than its form ought to prevail. Gregory v. Helvering,293 U.S. 465 (1935). They allege that the estate held an equity interest in LeBaron and that therefore the $84,650 represents a capital gain on the disposition of that interest to the Poirier group. It is difficult to resolve this issue because of the absence of written documents. The nine promissory notes were delivered by Louise to Carlos. Frank Occhipinti, president of LeBaron, pledged the notes as collateral for the $540,000 loan to LeBaron. There is apparently no written record of the understanding by which Louise *99 delivered the promissory notes to Carlos for the use of LeBaron. Carlos and J. Folse Roy, a shareholder of LeBaron and Jacqueline, testified that all the shareholders of these two corporations were aware of the estate's equity participation in LeBaron. Further, they testified that the shareholders were aware of the $84,650 distribution to the estate from the proceeds of the sale of the corporations. The inference intended by their testimony is that part of the LeBaron stock held by the Occhipintis was beneficially owned by the estate as consideration for LeBaron's use of the promissory notes. The facts fail to support the position of petitioners. Despite the testimony of Carlos and Mr. Roy, and an undated document signed on behalf of the estate alleged to be the formal distribution agreement of the shareholders executed before the sale, we cannot accept their interpretation of events. Petitioners' interpretation relies on the proposition that the Occhipintis held their stock in LeBaron not only for themselves but also as nominees for several other individuals. Carlos' testimony supported this arrangement but also suggested that the estate owned stock in this manner. However, *100 this latter suggestion of petitioners is inconsistent with other documents. Most importantly, the notice of acceptance of the Poirier group's offer, dated January 27, 1964, was signed by all the shareholders of LeBaron, Jacqueline, and Motor Hotels, those of record and otherwise.The estate is not listed. Carlos signed individually and not as an agent of the estate. Whenever Carlos acted in this capacity in other transactions, he signed the documents as agent. Therefore, we hold that petitioners have failed to establish that the $84,650 received by the estate was capital gain income. We so hold, recognizing that it is difficult to determine the precise nature of this income. Respondent argues that the $84,650 represents interest-type compensation for the use of the notes by LeBaron. The authority cited by respondent, Green v. Commissioner,367 F. 2d 823 (7th Cir. 1966), is inapposite. In Green, the taxpayer purportedly purchased shares in a corporation pursuant to an agreement for the repurchase of the shares at a later time for an amount higher than the taxpayer's purchase price. The Court of Appeals concluded that this was, in effect, a secured loan *101 rather than a sale of stock and taxed the proceeds as ordinary rather than capital gains income. Green v. Commissioner,supra at 825. The substance of the transaction in Green more closely conformed to the traditional definition of interest, compensation fixed by parties for the use of money, Fall River Electric Light Co. v. Commissioner,23 B.T.A. 168 (1931), than the transaction involved in this case. Here, instead of cash, personal property having a market value was loaned to the borrower. In any event, the $84,650 is not capital gain but represents gross income of the estate, taxable under section 61. As to the Golino payment, the respondent asserted alternately and inconsistently that the payment represented ordinary income to both Louise and Carlos. On brief, he made no argument respecting income to Louise but did argue that the $15,000 was income to Carlos. He did not indicate he was conceding the issue as to Louise. The facts surrounding the Golino issue are sparse. One thing is certain--that Golino's accountant treated the payment as a selling commission on his Federal income tax return. Since the check was made out *102 to Louise's estate and deposited in its account, we believe it is income to the estate and not to Carlos. The record does not establish that Carlos ever received the money. As to the delinquency penalty determined against Louise for the taxable year 1964 under section 6651(a), the petitioner offered no reasonable cause for the untimely filing of the return. The respondent's determination is therefore sustained. Carlos and Jacqueline Marcello (1964). Capital Gain v. Ordinary Income; Golino Payment; Negligence Penalty.
The facts described in Louise's case relating to the use of the nine corporate notes as security for the purchase of LeBaron and the later sale to the Poirier group are also applicable here and will not be repeated. The facts relating to the Golino payment also will not be repeated. OPINION Both the respondent and the petitioners agree that Carlos received $300,000 from the sale of LeBaron, Jacqueline, and Motor Hotels; and that $200,000 of this amount is capital gain. However, the respondent argues that the remaining $100,000 is a commission paid for negotiating the sale of LeBaron, Jacqueline, and Motor Hotels. The petitioners disputed this contention *103 by presenting testimony explaining that the additional $100,000 was paid to Carlos after the Poirier group learned of another potential purchaser of the stock. As has been noted, the two documents which constitute the agreement of the parties for the additional $100,000 consideration are inconsistent. The agreement of January 21, 1964 between Carlos and Douglas L. Black of the Poirier group states that Carlos was to be apid an additional $50,000 as consideration for his negotiation of the sale of LeBaron, Jacqueline, and Motor Hotels. A later agreement between the same parties, dated January 27, 1964 states that Carlos was to receive an additional $100,000 as part of the total purchase price for his stock in the corporations. Douglas L. Black was not called as a witness by respondent but he did submit a statement dated April 2, 1968, to respondent's agents during the investigation of this case stating that the $100,000 paid to Carlos was compensation for his negotiation of the sale. At the trial, Leon Poirier, a member of the Poirier group who witnessed both agreements, testified that Carlos did not negotiate the sale of the corporations and that the $100,000 was part of the *104 purchase price of his stock. We think that petitioner Carlos Marcello has carried his burden on this point, especially since the respondent failed to call a crucial witness, Douglas L. Black. Respondent's pretrial memorandum stated that he intended to call Mr. Black. Therefore, we disagree with respondent that the $100,000 received by Carlos is ordinary income under section 1.61-2(a), Income Tax Regs. We hold that this amount represents capital gains income. With respect to the Golino payment, we have already held it is income to Louise's estate and not income to Carlos. Finally, for the year 1964 the respondent determined a negligence penalty under section 6653(a). That section imposes an addition to tax if any part of any underpayment is "due to negligence or intentional disregard of rules and regulations (but without intent to defraud)." The petitioners have the burden of proving that the imposition of the negligence penalty was erroneous. Further, the respondent's determination is presumptively correct. Since the record is devoid of any evidence to *105 the contrary, the petitioners are liable for the addition to tax as determined by the respondent. England v. Commissioner,34 T.C. 617 (1960); Reily v. Commissioner,53 T.C. 8 (1969). We also think the nature of some of the adjustments made to the 1964 return (overstated expenses, understated income) shows negligence and disregard of rules and regulations. Carlos and Jacqueline Marcello (1965). Legal Fees; Basis in Old Southport Club Mortgage; Negligence Penalty.
FINDINGS OF FACT In 1961, Carlos and his brother Joseph Marcello, Jr., were indicted in the United States District Court for the Eastern District of Louisiana for the forgery of a birth certificate to avoid deportation. They were tried and acquitted in 1963. One year later, Carlos and Joseph Matassa were indicted in the same Federal court for the bribery of a juror who voted to acquit in the forgery trial.In 1965, both defendants were acquitted. In the bribery trial, the government sought to prove that the funds for the alleged bribe were recorded on the books of the Pelican Tomato Company (hereinafter referred to as "Pelican"), a produce dealer in New Orleans. The juror, *106 who claimed he had been bribed, made a number of trips to Pelican to see Joseph Matassa in an attempt to collect the promised funds. Carlos Marcello was a commission employee of Pelican from 1963-1966 and received substantial amounts of income from the company in those years. The United States Attorney who prosecuted the bribery case was Louis LaCour. He said the bribery charge was personal to Carlos and Joseph Matassa and not against Pelican. He also stated that the government did not contend that the money was paid on behalf of Pelican or that the payment had any connection with Carlos' employment with Pelican. On or about July 25, 1960, Riverside Drive Company, Inc. purchased real property designated as "Old Southport Club" for $130,000, represented by $1,500 cash and a mortgage note executed on behalf of Riverside Drive Company, Inc. in the amount of $128,500. Carlos Marcello owned and held a 10 percent interest in the Riverside Drive Company, Inc., mortgage and note from the date of its execution. Carlos Marcello later acquired ownership of the remaining 90 percent interest in the Riverside Drive Company, Inc., mortgage and note prior to the retirement and total collection *107 thereof.On or about July 18, 1965, $110,000 was paid Carlos Marcello, as a result of which payment the July 25, 1960 mortgage and note was extinguished and retired. No income was reported on the Federal income tax return of Carlos and/or Jacqueline Marcello for the taxable years 1960 through 1965, inclusive, from the Old Southport Club mortgage note. Carlos' basis in the Riverside Drive Company, Inc. note of July 25, 1960 was substantiated at least to the following extent: Carlos Marcello's original 10 percent
$12,800
Interest purchased from Guy Chivleatto,
Jr., prior to July 7, 1960
5,000
Interest purchased from Anthony Trapani,
July 22, 1960
5,000
Interest purchased from Anthony Marcello,
1962
3,000
Interest purchased from Steve Quartano,
February 12, 1964
2,000
$27,800
OPINION Respondent argues that the $14,144.71 claimed legal expense deduction in connection with the 1964-1965 bribery case should be disallowed.He bases his argument on the premise that there must be a direct relationship between the expenses claimed and the petitioners' business activities, citing United States v. Gilmore,372 U.S. 39 (1963); and Nadiak v. Commissioner,356 F. 2d 911 (2d Cir. 1966). *108 He asserts that the petitioners have failed to present any evidence which would establish such a relationship. On the other hand, the petitioners argue, in essence, that "the nexus between the legal expense at issue and the business activities of Carlos" is that "Those two checks were the evidence relied upon by the Government for its circumstantial evidence against Carlos." The petitioners then seek to factually distinguish the cases cited by the respondent from the instant case and cite Surasky v. United States,325 F. 2d 191 (5th Cir. 1963); and Rev. Rul. 64-277, 1964-2 C.B. 55. In Commissioner v. Tellier,383 U.S. 687, 689 (1966), the Supreme Court, referring to United States v. Gilmore,supra, indicated that the origin and character of the claim with respect to which an expense was incurred, rather than its potential consequences upon the fortunes of the taxpayer, is the controlling basic test of whether the expense was "business" or "personal" within the meaning of section 162(a). Applying that rule to the facts of the instant case, we hold that the legal expense claimed here must be disallowed. *109 The mere fact that Pelican had an account on its books in Carlos' name and that the checks used in the bribery attempt may have been drawn on that account does not place the origin or character of the expense in the business category. There is no real business connection between the bribery indictment and Carlos' employment with Pelican. Indeed, the bribery trial had its origins in the deportation proceedings where the petitioner previously attempted to deduct the legal fees and failed. Marcello v. Commissioner,380 F. 2d 499 (5th Cir. 1967), affg. 43 T.C. 168 (1964), cert. denied 389 U.S. 1044 (1968). The claimed expenses here are no less personal and therefore are nondeductible. The Surasky case cited by the petitioners unquestionably involved an activity which involved the production of income under section 212 and the Court so held. In Rev. Rul. 64-277, the facts involved a serviceman whose legal fees were directly related to his retention in the service--again there being no real question about the business relationship. As to the "Old Southport Club" mortgage, the respondent asserts that under section 1016(a)(1) *110 the petitioners' cost basis of $27,800 is subject to adjustment and reduction for any receipts not previously taken into income, but rather charged against capital, resulting in the reduction of the mortgage principal. Since no income was reported by Carlos or Jacqueline Marcello for the years 1960 through 1965 from any receipts resulting in the $18,500 reduction (the original mortgage was $128,500 and the retirement payment was $110,000), the respondent treated the $18,500 as a recapture of basis which reduced the petitioners' basis to $9,300 on the retirement date. While the petitioners argue that the basis and gain reported on the 1965 income tax return should not be adjusted by the respondent, and while they argue that Carlos actually did not receive but lost the $18,500, they introduced no evidence to support the allegation or to rebut the presumption of correctness of the respondent's determination. Consequently, we hold that the respondent's adjustment to basis is correct. Finally, with respect to the negligence penalty under section 6653(a), we hold that the penalty is applicable for the same reasons set forth as to the year 1964. Jefferson D. II and Louise Hampton; *111 William J. and Florence Robards; Joseph C. and Barbara Marcello. Compensation Income; Negligence Penalty. FINDINGS OF FACT Petitioners Joseph C. and Barbara Marcello (hereinafter referred to as "Joseph") are individuals who were legal residents of Metairie, Louisiana, at the time of the filing of their petition herein. Their joint Federal income tax return for the taxable year 1965 was filed with the District Director of Internal Revenue, New Orleans, Louisiana. Petitioners Jefferson D. II and Louise Hampton (hereinafter referred to as "Jefferson") are individuals who were legal residents of Metairie, Louisiana, at the time of the filing of the petition in their case. Their joint Federal income tax return for the taxable year 1965 was filed with the District Director of Internal Revenue, New Orleans, Louisiana. Petitioners William and Florence Robards (hereinafter referred to as "William" are individuals who were legal residents of Metairie, Louisiana, at the time of the filing of the petition in their case. Their joint Federal income tax return for the taxable year 1965 was filed with the District Director of Internal Revenue, New Orleans, Louisiana. Joseph *112 is the son of Carlos. Jefferson and William are sons-in-law of Carlos. In February of 1965, Carlos decided to remedy the default on the notes of the nine corporations previously discussed herein. Foreclosure was dismissed as a course of action because Carlos thought it would involve substantial fees.A suit against Culotta for payment of the notes was thought impractical because of the difficulty in collecting a judgment. Thus, Carlos decided not to sue Culotta provided that Culotta transferred the stock of the nine corporations to the Marcello heirs. Upon the advice of his attorneys, Carlos decided to place the stock of the nine corporations received from Culotta in the hands of individuals whom he could trust. He selected his sons-in-law, who are petitioners herein, and a close friend, Michael Maroun (hereinafter referred to as "Michael"), an attorney. To accomplish this transfer, a meeting was held on February 25, 1965, at the offices of Harold J. Zeringer, Jr. (hereinafter referred to as "Zeringer"), a New Orleans attorney and secretary of the nine corporations. At this meeting, the 50 shares of the nine corporations owned by Joseph Connolly were transferred to the four *113 individuals, each receiving 12-1/2 shares. Culotta pledged his 50 shares to the estate as security for payment of the notes. Culotta and Zeringer resigned from the board of directors and the offices of president and secretary, respectively, of the nine corporations. Jefferson was elected president; Michael, vice-president; Joseph, secretary; and William, treasurer. The minutes of the meeting state that the 50 shares issued to Jefferson, Joseph, Michael, and William were in consideration for services rendered and to be rendered to the nine corporations by these individuals. Zeringer, the attorney who drafted the board resolution for the issuance of the shares, included the recital of consideration to fulfill a requirement of local law. He did not know of any services performed by the transferees of the shares prior to February 25, 1965. Jefferson, Joseph, William, and Michael did not receive any payments for services rendered to the nine corporations. They never considered themselves as owners of the stock but as nominees for the heirs of the estate. All 50 shares were delivered to Joseph as secretary of the corporation. The stock certificates were then given to Carlos and *114 kept in his custody. Several years later, the exact date is unclear in the record, Jefferson, Joseph, William, and Michael endorsed the certificates and signed statements disclaiming any interests in the shares. Jefferson, as president of the nine corporations, signed loans, land sales documents, board resolutions, and Federal income tax returns; he also presided at a meeting of the board. Joseph, as secretary, signed but did not prepare corporate documents. He also signed checks drawn against the account of Louise to repay a bank loan undertaken by the nine corporations. William, as treasurer, did not sign any documents or take any other actions in his official capacity on behalf of the nine corporations. OPINION Respondent determined deficiencies against the petitioners for the taxable year 1965 because of alleged unreported compensation income taxable under section 1.61-2(d)(1), Income Tax Regs. Respondent claimed that each petitioner received 12-1/2 shares of stock in the nine corporations as compensation for services rendered or to be rendered. Each petitioner held the same corporate office in each of the nine corporations. Petitioners argue *115 that they performed their services on behalf of the heirs of the estate. Each petitioner testified to this effect and further stated that he did not receive any compensation from the corporations at any time.
The issue involved here is purely factual.None of the parties have cited any case law in support of their positions.We believe that the services performed by Jefferson as president and Joseph as secretary of the nine corporations were perfunctory. The record does not show whether William performed any services as treasurer. The evidence indicates that the petitioners did not exercise any control over their stock in the nine corporations consistent with legal or beneficial ownership. Further, they did not receive any compensation for their services as corporate officers. The record is unclear with respect to respondent's claim that Michael, not a petitioner, used his 12-1/2 shares as collateral for an $18,000 loan from Carlos. We hold that the evidence supports petitioners' contention that they held their shares in the nine corporations as nominees for the estate, and that respondent erred in determining deficiencies against petitioners for unreported compensation income.
*116 With respect to the negligence penalty under section 6653(a), the evidence shows that the adjustments stem from complex legal issues which can represent honest differences of opinion. In addition, there is no evidence of failure to keep adequate records. Therefore, the addition to tax is not sustained. Joseph, Jr. and Anastasia Marcello--Shareholder Loan. FINDINGS OF FACT Joseph, Jr. and Anastasia Marcello are individuals who were legal residents of Metairie, Louisiana, at the time of the filing of the petition in their case. Their joint Federal income tax return for the taxable year 1965 was filed with the District Director of Internal Revenue, New Orleans, Louisiana. J & J Realty Company, Inc. (hereinafter referred to as "J & J") is a Louisiana corporation organized in 1957 with an outstanding capital stock of $9,000. Joseph Jr. contributed $6,000 and Joseph Paretto (hereinafter referred to as "Paretto") contributed $3,000 to the capital stock of the corporation. Joseph Jr. was J & J's president from its date of incorporation to the date of trial. From 1962 to 1965, Paretto and Joseph Jr. each owned 50 percent of the stock of J & J. On March 9, 1965, J & *117 J, by Joseph Jr., president, executed a demand note for $30,000 to the Metairie Savings Bank & Trust Company, Metairie, Louisiana. On this same date, a deposit of $29,555.25 was made to the "Special" account of Joseph Jr. in the Metairie Savings Bank & Trust Company. On or about March 12, 1965, Joseph Jr. purchased all the outstanding shares of J & J stock held by Paretto for $18,000. Joseph Jr. used the bank loan obtained by J & J to purchase Paretto's stock. John W. Conolle, C.P.A., prepared the 1965 Federal income tax return of Joseph Jr. and the 1964-1969 returns of J & J. He said Joseph Jr. executed a demand note for $30,000 payable to J & J on March 10, 1965, but the original could not be found. Instead, a purported copy of the original was prepared two weeks prior to the trial. Although respondent's auditing agent, Oneal Labat, requested the original note in September of 1969 prior to the filing of his report, neither Joseph Jr. nor Mr. Connolle answered this request. Joseph Jr. made some repayments on the loan but the entire amount has not been repaid. The J & J balance sheets for the fiscal years 1966-1969 indicate that Joseph Jr. maintained an outstanding indebtedness *118 to the corporation of about the same amount as the loan. Thus, if any repayments were made, they apparently were not substantial. Joseph Jr. intended to repay the note. The balance sheets also show that J & J incurred the expense of repaying the bank loan. The loan from J & J to Joseph Jr. was not secured by collateral. Since its organization in 1957, J & J has not made any dividend payments to its shareholders. OPINION The controlling factor in determining if a distribution to a shareholder is a loan or one subject to treatment under section 301(c) is whether there was an intent at the time of the distribution to make a loan; i.e., whether the parties to the distribution contemplated its repayment. Atlanta Biltmore Hotel Corp. v. Commissioner,T.C. Memo. 1963-255, affd. and modified 349 F. 2d 677 (5th Cir. 1965). Many factors have been considered by the courts to weigh the apparent manifestations of such intent. These include proof of any agreement (entered into contemporaneously or prior to the distribution) for repayment, the existence of a set maturity *119 date for repayment, the record of interest payments, repayment of the principal distributed, the type of collateral security furnished the corporation, and the dividend history of the corporation. Levy v. Commissioner,30 T.C. 1315, 1327 (1958); Bibb v. Commissioner,T.C. Memo. 1965-296.
Of probative value are the independent facts and circumstances surrounding the transaction. Where, as here, the distributions are made to a shareholder controlling the corporation, such control invites special scrutiny. Roschuni v. Commissioner,29 T.C. 1193 (1958), affd. 271 F. 2d 267 (5th Cir. 1959), cert. denied 362 U.S. 988 (1960). Interest and repayment schedules are particularly important factors evidencing intent. Occhipinti v. Commissioner,T.C. Memo. 1969-190; Berthold v. Commissioner,404 F. 2d 119 (6th Cir. 1968). Here, although seven years have passed, none of the distribution has been repaid to the corporation; in fact, the corporation's books indicate that Joseph Jr.'s account had an outstanding balance at the end of the fiscal year 1970 in excess of the amount *120 distributed on March 9, 1965. Furthermore, interest on the distribution was never paid or accrued on the corporation's books; the corporation received no security by mortgage or any other type of collateral; and, prior to the March 9, 1965 distribution, J & J had never declared a formal dividend. We think the self-serving testimony of the petitioner relating to his intention to repay the distribution on some nebulous date in the future is not sufficiently persuasive to treat the distribution as a loan; nor is the fact that the distributions were carried in the corporation's books as loans sufficiently persuasive. Chism's Estate v. Commissioner,322 F. 2d 956 (9th Cir. 1963). Conversely, failure to make repayment supports the inference that a permanent distribution rather than a loan was intended. Spheeris v. Commissioner,T.C. Memo. 1959-225, affd. 284 F. 2d 928 (7th Cir. 1960), cert. denied 366 U.S. 944 (1961). Weighing the objective factors against the testimony of Joseph Jr. and Mr. Connolle, which testimony is at best inconclusive and unclear, we hold that the $29,555.25 distributed to Joseph Marcello, Jr. *121 in 1965 is a constructive dividend taxable under section 301(c). In view of the foregoing, Decisions will be entered under Rule 155. Footnotes
1. Carlos and Jacqueline Marcello, docket No. 3591-68; Jefferson D. II and Louise Hampton, docket No. 2096-69; William J. and Florence Robards, docket No. 2097-69; Joseph C. and Barbara Marcello, docket No. 2098-69; Carlos and Jacqueline Marcello, docket No. 2099-69; and Joseph Marcello, Jr. and Anastasia Marcello, docket No. 1734-70, have been consolidated for trial, briefs and opinion.↩
2. Mr. Sutton died in August 1974.↩