Jack SURASKY, Appellant,

v.

UNITED STATES of America, Appellee.

No. 20296.

United States Court of Appeals
Fifth Circuit.

Nov. 27, 1963.

Mark Hulsey, Jr., Joseph M. Glickstein, Jacksonville, Fla., Seymour S. Mintz, William T. Plumb, Jr., Washington, D. C., for appellant; Glickstein, Crenshaw, Glickstein & Hulsey, Jacksonville, Fla.,

Hogan & Hartson, Washington, D. C., of counsel.

Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Atty., Dept. of Justice, Washington, D. C., Edith House, Asst. U. S. Atty., Miami, Fla., Donald C. Lehman, Asst. U. S. Atty., Jacksonville, Fla., Meyer Rothwacks, Frederick Youngman, John Murray, Attys., Dept. of Justice, Washington, D. C., William J. Hamilton, Jr., Asst. U. S. Atty., Jacksonville, Fla., for appellee; Edward F. Boardman, U. S. Atty., of counsel.

Before TUTTLE, Chief Judge, and JONES and BELL, Circuit Judges.

TUTTLE, Chief Judge.

This appeal challenges the correctness of the judgment of the district court holding that the sum of $17,000 contributed by the taxpayer to the Wolfson-Montgomery Ward Stockholders Committee as a part of a proxy battle during 1955 was not allowable as a deduction as an ordinary and necessary non-business expense.[1]

The facts are not in dispute since substantially all of the facts were either stipulated between the parties or proved by undisputed affidavit and a deposition which was not in any way countered.

The taxpayer purchased 4000 shares of stock of Montgomery Ward & Co. in 1954 and 1955, at a total cost of $296,870.20. In making the purchase, he acted on the recommendation of Louis E. Wolfson after he made a personal investigation of the financial condition of Montgomery Ward & Co. Taxpayer purchased the stock for the sole reason that he thought it was a good chance to make money, in that it was a good long term investment because of anticipated increased dividends and appreciation in the value of the stock through improvements in the condition of the company. Mr. Wolfson, who had purchased more than 50,000 shares of the stock, had laid out what he believed to be an aggressive program which he testified he thought would improve the company and greatly enhance the value of the stock. In pursuing his plans he attempted, without success, to discuss his proposals with the management. Thereafter, the taxpayer and other stockholders formed a Committee known as the Wolfson-Montgomery Ward Stockholders Committee. The objectives of the Stockholders Committee were set out in a document entitled "Let's Rebuild Montgomery Ward."[2] This document made it clear that the Stockholders Com-

1. Section 212, 26 U.S.C.A. provides as follows:

"Expenses for production of income

"In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year—

"(1) for the production or collection of income;

"(2) for the management, conservation, or maintenance of property held for the production of income; or

"(3) in connection with the determination, collection, or refund of any tax.

2. Although the parties stipulated: "The objectives of this Committee were set forth in a document entitled 'Let's Rebuild Montgomery Ward', * * * which the Committee circulated, together with other similar material, to the stockholders of Montgomery Ward & Co. * * *," and although the document clearly stated the objectives to include the establishment of new stores, the relocating, modernizing or repairing of others, expanding manu-

facturing operations, improving employee morale, and making changes generally in advertising, merchandising, sales, financial and personnel policies for the purpose of seeking increased dividends and a stock split, the Government, in its brief, states, "The object of the Wolfson Committee was to displace a majority of the Board of Directors and the existing management of Ward and replace them with its own nine candidates for the Board and new management."

The court also, in its finding No. 4 stated, "The object of the Wolfson Committee was to displace a majority of the Board of Directors and the existing management of Ward and replace them with its own nine candidates for the Board and new management."

The stipulation further provides, "The Committee proposed to *accomplish its objectives* by displacing a majority of the Board of Directors and existing management of the corporation with its own candidates for the Board and new management."

mittee advocated far-reaching changes in the management of the company. It expressly called for the establishment of new stores; relocating and modernizing or repairing others; expanding manufacturing operations; developing private brands; increasing inventory turnovers; obtaining the services of outstanding merchandising personnel; improving employee morale; and generally revamping and bringing up to date all policies touching on advertising, merchandising, sales and corporate financing. The Committee expressly sought increased dividends and a stock split. The Stockholders Committee sought to accomplish these objectives by means of electing a new Board of Directors, or at least a majority of the Board which would then provide new management. It started a proxy campaign for the regular annual meeting of stockholders scheduled for April 22, 1955. In this effort, it incurred substantial expense which was financed by payments made from members of the Committee and other stockholders.

The taxpayer paid the Stockholders Committee $17,000 in 1955, which was expended for the purpose of the Committee during that year. The taxpayer was not an officer, director or employee and did not seek a position either as a director or as an officer or employee of the company. His stated purpose for making the payments was that he believed his opportunity to make more money from his stock investment was much greater if the purposes of the Committee could be accomplished.

It turned out that, while the drive was unsuccessful in placing a majority of the Stockholders Committees' candidates on the Board of Directors, it was at least partially successful in that three of its nominees were placed on the board of nine directors. Also, immediately after the election the Chairman of the Board and the President resigned. The Chairman of the Board and President were the focus of the attack by the Committee in challenging the current management policies of the company. It also eventuated that sales and earnings of the company increased during the latter half of the fiscal year ended January 31, 1956; the regular quarterly dividend was increased by the Directors at a meeting held on November 28, 1955, from $ .75 per share to $1.00 per share, and an extra dividend of $1.25 per share was voted on the common stock. At the same meeting, the Board recommended a two-for-one split of the common stock, which was accomplished the following year. The market quotations of the stock increased substantially during 1955.

The taxpayer's venture in Montgomery Ward stock was a profitable one in that he received dividends totalling $30,000 on the stock purchased by him in less than a two year period, and he sold his stock in the first eight months of 1956, realizing a capital gain of $50,929.55.

Trying the case without a jury, the trial court based its legal conclusion that the expenditures were not deductible on the following summarization of the facts:

"To summarize the facts, the plaintiff herein contributed $17,000 to a committee which was to use the money to solicit proxies from other shareholders of a large, publicly-held corporation, in the hope that the committee would be able to seat a sufficient number of its candidates on the board of directors so that new management policies could be carried out which might result in larger profits and larger dividends to the shareholders.

"The plaintiff had clear title to his Ward stock and was receiving dividend income therefrom. It was certainly most speculative whether his contribution to the Wolfson Committee would touch off a series of events culminating in the production of increased income to the plaintiff. Furthermore, the plaintiff was not a candidate for the board of directors nor does the record reflect that he anticipated obtaining a position in Ward's management.

\* \* \*

"The Court specifically finds lacking the necessary proximate relationship between the expenditure and the production of income or the management of income producing property. At the time the plaintiff contributed his funds to the committee, it was pure speculation whether he would derive any monetary reward therefrom. At the time the expenditure was made, the Court could certainly not find that it was necessary, nor was it even ordinary, within the common meaning of that word.

"The Court is not unmindful of the fact that the plaintiff, at the time he contributed the $17,000 to the committee, did so with hopes of realizing a profit and that, as a matter of fact, the dividends on his stock increased following the election of three of the Wolfson Committee's candidates. However, it is necessary to view the instant transaction as of the time it occurred, without the benefit of hindsight. The record is completely devoid of any evidence of a direct proximate relationship between the plaintiff's expenditure and the increased dividends; the latter could have been caused by any one of a myriad of factors. As for the plaintiff's desire to make a profit, there are any number of transactions entered into by the parties with a profit motive which are not accorded preferential tax treatment. The Treasury cannot be expected to underwrite all profit seeking speculations."

■ The appellant here urges that in its stressing of the "speculative" nature of the expenditure and the court's apparent reliance on the theory that for an expense, to be deductible under subparagraph 2 of Section 212, i. e., "for the management, conservation, or maintenance of property held for the production of income," there must be some threat of the loss of the property by the taxpayer, the court has imposed too rigid a requirement. We agree.

There is one thing both parties here agree upon, that is, that it was to change the result of the distinction between "business" and "personal" expenses that Section 212 was added to the Internal Revenue Code in 1942. The United States, in its brief, cites the decision by the Supreme Court in McDonald v. Commissioner, 323 U.S. 57, 61, 65 S.Ct. 96, 89 L.Ed. 68, as authority for the following statement: "In order to correct the inequity of making non-trade or non-business income taxable, but not allowing non-trade or non-business expenses to be deducted, Congress allowed a deduction in the new subsection (a) (2) for 'all the ordinary and necessary expenses paid or incurred' (1) 'for the production or collection of income' or (2) 'for the management, conservation, or maintenance of property held for the production or collection of income.' "

The parties also agree that in construing the language of Section 212, it is to be taken in *pari materia* with Section 162 so far as relates to the language "ordinary and necessary business expenses." [3]

From the manner in which the trial court stressed the terms "speculative" and "speculation" it is apparent that the court may have been too greatly persuaded by the language of the income tax regulations declaring, in Section 1.212–1 (d), that "expenses to be deductible under Section 212, must be 'ordinary and necessary'. Thus, such expenses must be reasonable in amount and must bear a reasonable and proximate relation to the production or collection taxable income or to the management, conservation, or maintenance of property held for the production of income." While we do not determine that this regulation is not warranted by the section of the statute with which we are involved, we think that it

3. 26 U.S.C.A. § 162 provides as follows:
"§ 162. Trade or business expenses
"(a) In general.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *."

has been construed by the trial court to require much too difficult a showing of proximate cause in the common-law tort concept than is required by the statute. ·

It will be noted that nothing in the statute expressly requires a showing of a "proximate relation to the production or collection of taxable income." None of the cases cited to us by the United States contain such language. We think Congress had in mind allowing deduction of expenses genuinely incurred in the exercise of reasonable business judgment in an effort to produce income that may fall far short of satisfying the common law definition of proximate cause. Thus, we think the use of the term "speculative" is not an apt expression that would describe the determining factor in deciding this issue.

This Court has held in Harris & Co. v. Lucas, Commissioner, 5th Cir., 48 F.2d 187,

> "It is evident that the words 'ordinary' and 'necessary' in the statute are not used conjunctively, and are not to be construed as requiring that an expense of a business to be deductible must be both ordinary and necessary in a narrow, technical sense. On the contrary, it is clear that Congress intended the statute to be broadly construed to facilitate business generally, so that any necessary expense, not actually a capital investment, incurred in good faith in a particular business, is to be considered an ordinary expense of that business. This in effect is the construction given the statute by the Treasury Department and the courts. * * *" 48 F.2d 187, 188.

██ This Court has cited the Harris case a number of times with approval, most recently in Lutz v. Commissioner of Internal Revenue, 5 Cir., 282 F.2d 614, 617.[4]

In dealing with the "necessary" part of the formula, the Supreme Court has indicated in Welch v. Helvering, 290 U.S. 111, at page 113, 54 S.Ct. 8, at page 9, 78 L.Ed. 212, that this requirement may be satisfied if the expenditures "were appropriate and helpful", saying as to the taxpayer, Welch, "He certainly thought they were, and we should be slow to override his judgment."

Then, dealing with the question of what expenses are "ordinary" the Supreme Court in the same opinion said, "Here, indeed, as so often in other branches of the law, the decisive distinctions are those of degree and not of kind. One struggles in vain for any verbal formula that will supply a ready touchstone. The standard set up by the statute is not a rule of law; it is rather a way of life. Life in all its fullness must supply the answer to the riddle."

██ Here, it seems incontestable that the payments made by the taxpayer were made with the anticipation that profit to the taxpayer would result. It may have been a long chance that Mr. Surasky was taking. However, he testified he knew Mr. Wolfson well enough to know his ability and believed that there was reasonable likelihood of success. This testimony is undisputed. In point of fact, the activity resulting from the expenditures by the taxpayer and his associates did produce direct and tangible results in that three nominees of the Committee were elected to the Board of Directors, the President, who had been severely criticized by the Committee was caused to resign as was the Chairman of the Board, and many other actions which parallel those sought for by the Committee were undertaken by the corporation. Profits were increased; dividends were increased; the stock enhanced in value. We think that for a trial court to conclude that there was not sufficient con-

---

4. The entire paragraph from the Harris & Co. case is quoted above although it is clear that the Supreme Court in Welch v. Helvering, 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212, has held that in order to qualify as a business deduction an ex- penditure must be *both* necessary *and* ordinary. However, we still believe that they need not be "both ordinary and necessary in a narrow, technical sense," as stated in the Harris & Co. case.

nection between the expenditure to. assist the Committee in its activities and the achievement of so many of its objectives was too remote to meet the test of what is reasonable and ordinary in this particular type of investor activity is to apply too rigid a standard in the application of a remedial statute.

■ While there are differences in the facts, as there must always be in different cases, we think that the Tax Court decision in Alleghany Corporation, 28 T.C. 298, acq. 1957–2 C.B. 3, points the direction in which the statute should be applied. The expenditures there sought to be deducted were for proxy solicitation and other committee activities in a railroad reorganization. To be sure, the proposal that was fought successfully in that case would have resulted in diluting the taxpayer's common stock possibly to the vanishing point. However, we think it immaterial whether the expenditure is directed towards an effort to prevent the loss or dilution of an equity interest or to cause an enhancement or increase of the equity value, as was the undoubted purpose in the case before us. The Tax Court there said, 28 T.C. page 304, "We think it is clear that the expenditures in question were made for no other purpose than to protect petitioner's business." See also Shoe Corporation of America, 29 T.C. 297, 1957, acq. 1958–2 C.B. 7, and Allied Chemical Corp. v. United States (Ct.Cl.1962), 305 F.2d 433.

■ It appearing, as we have noted above, that the decision of this case was based on undisputed evidence, most of which was stipulated, our review of the decision of the trial court is somewhat freed from the "clearly erroneous" rule. See Patterson v. Belcher, 5th Cir., 302 F.2d 289, 292, cert. denied, 371 U.S. 921, 83 S.Ct. 289, 9 L.Ed.2d 230; Galena Oaks Corporation v. Scofield, 5th Cir., 218 F.2d 217, 219.

The judgment is reversed and the case is remanded to the trial court for the entry of a judgment in favor of the appellant, taxpayer.