JEAN NIDETCH, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Nidetch v. Commissioner
Docket No. 7396-75.
United States Tax Court
T.C. Memo 1978-313; 1978 Tax Ct. Memo LEXIS 202; 37 T.C.M. (CCH) 1309; T.C.M. (RIA) 78313; August 11, 1978, Filed Leonardo T. Radomile and Mead I. Greenberg, for the petitioner. Steven L. Wood, for the respondent. SCOTT MEMORANDUM OPINION SCOTT, Judge: Respondent determined a deficiency in petitioner's Federal income tax for the years 1971 and 1972 in the amounts of $ 11,377 and $ 65,252, respectively. Certain *203 issues raised by the pleadings have been disposed of by agreement of the parties, leaving for decision whether petitioner properly deducted under section 162(a) or section 212, I.R.C. 1954, [1] attorney's fees in the amounts of $ 1,100 and $ 102,500 for the years 1971 and 1972, respectively. All of the facts have been stipulated and are found accordingly. Petitioner, who was a legal resident of Los Angeles, California, at the time of the filing of her petition in this case, timely filed her Federal income tax returns for each of the years 1971 and 1972. Petitioner is one of the founders of Weight Watchers International, Inc. (Weight Watchers). During 1971 and 1972 petitioner was a substantial shareholder, a member of the board of directors and president of Weight Watchers. She devoted substantially all her time to the corporation's business affairs and substantially all of her income was from her salary and dividends from Weight Watchers. Weight Watchers was formed in 1963. At that time the controlling *204 interest was evenly divided between petitioner and her husband and Mr. and Mrs. Albert Lippert. In 1971 and 1972 Mr. Lippert served as chairman of the board of the corporation. During the years 1967 through 1969, differences of opinion developed between petitioner and other members of the board of Weight Watchers with regard to the management policy of the corporation. When it became apparent that important differences with respect to management policy could not be resolved, petitioner retained the services of an attorney to advise her with respect to the steps to be taken to resolve the problems with the opposing faction of management. Petitioner subsequently engaged the advice of two other attorneys who specialized in the field of proxy litigation. Petitioner believed that the management policy being followed by Weight Watchers was deficient and that the corporation was not being run in the best interest of the corporation or its shareholders in the following respects: (1) Not all of the directors were being provided with enough policy information to make decisions on major issues during board meetings. (2) The board of directors was controlled by a group composed of *205 opposing management's family and friends who lacked the experience and ability to run a multi-million dollar publicly-held corporation. (3) Although the corporation had substantial earnings, it was paying no dividends. (4) The corporation's policy toward its franchises was unwise in that there was friction between the franchisees and the corporation. (5) The board's philosophy regarding the publishing policy was unwise in that the magazine publishing business should either be restructured or spun off as a separate entity. (6) Petitioner took issue with the terms of a pending merger with Bristol-Meyers Company and in the choice of an investment banker. (7) Petitioner did not believe that the corporation's mailing list should be sold to outside sources since such action could be detrimental to Weight Watchers' own mailing campaigns. On the basis of discussions with her respective counsel and with various members of the business and financial community, petitioner believed that her position as president of the company could be in jeopardy due to the tension between her and other officers and directors. This fact together with the corporation's restrictive dividend policy, *206 both of which could potentially endanger petitioner's primary source of income, led petitioner to decide to undertake a proxy contest. In early 1970 there were 1,025,000 shares of Weight Watchers stock outstanding. Petitioner owned some 162,500 shares of Weight Watchers. Her husband, Mortimer Nidetch, owned some 137,500 shares. The 300,000 shares owned and controlled by petitioner and her husband accounted for approximately 29.24 percent of the outstanding stock of the company. The opposing management group controlled 48.78 percent of the outstanding stock. The remaining 21.98 percent of the stock was in the public market, with a large portion held by franchisees. On January 2, 1966, petitioner and her husband had executed two irrevocable trusts naming their sons, David and Richard Nidetch, as beneficiaries. They contributed 25,000 shares of Weight Watchers stock to each of the trusts at the time of their inception. The original trustees of these trusts were Martin Weinstein and Charles Feit. These trustees, who pursuant to the trust agreements had sole power to vote the Weight Watchers shares held by the trusts, were regarded by petitioner as being closely aligned with *207 the management group she was opposing. The 50,000 shares in the two trusts amounted to approximately 5 percent of the outstanding shares of Weight Watchers and were included in the opposing management group's outstanding stock percentage of 48.78. Petitioner determined that by replacing the two trustees with individuals who were more closely aligned with her position, she would have a reasonable chance of success in a proxy contest. A change in trustees would reduce by 5 percent the stock held by the management group and increase petitioner's respective share by 5 percent. Accordingly, petitioner undertook steps to change the trusteeship of the trusts by requesting the trustees to resign.She simultaneously met with various franchisees of the corporation to elicit their support. Each trust agreement provided that the trust would be administered in New York and its validity, construction and all rights thereunder would be governed by the laws of New York. Under section 77 of the New York Civil Practice Law and Rules, before a trustee can resign from his fiduciary position he must make *208 an accounting which is satisfactory to the responsible judicial forum. Normally, the expenses incident to this accounting are borne by the trust. Each of the trust agreements contained the following provision: 11. Accounting and Compensation. The Trustee shall render an annual accounting of the Trust to the beneficiary, and such reasonable costs as are incurred in connection therewith shall be reimbursed and/or paid out of Trust funds. The Trustee and Successor Trustee designated herein shall receive no compensation for services rendered under this agreement, except as set forth in this paragraph. On June 26, 1970, Charles Feit, one of the original trustees, and Manny Mark, a successor trustee for the two trusts, addressed a letter to the law firm of Geller, Gold and Cuddy authorizing the firm to file on their behalf and to prosecute petitions to the Supreme Court of the State of New York for settlement of the trustees' account and for leave to resign as trustees of the two trusts. This authority was specifically conditioned upon the understanding that the trustees would not be required to pay any legal fees or other costs and expenses incident to the filing for settlement *209 of account and for leave to resign and that all such fees, costs and expenses would be borne by petitioner. At the bottom of this letter the following appeared: Gentlemen: Pursuant to the foregoing, I agree to pay your fee for legal services rendered to and on behalf of Mr. Manny Mark in connection with this matter, the sum of $ 1,500.00 * no later than July 10, 1970. /s/ Jean Nidetch / Mrs. Jean Nidetch On January 15, 1971, petitioner, as one of the settlors of the trusts, signed an agreement in which she requested the appointment of Sanford E. Moore, Esquire, an attorney admitted to practice in New York, as Substituted Trustee under each of the trusts upon judicial acceptance of the resignations of the present trustees which were then pending before the Court. Petitioner further agreed to indemnify the trusts for any expenses incident to this substitution by stating in her request the following: In order to save the Trusts harmless from Mr. Moore's fees and commissions as Trustee, to the end that the assets of the Trusts *210 will not be charged with such fees and commissions, the undersigned hereby undertakes to pay such fees and commissions as would otherwise be chargeable to the Trusts. When Manny Mark and Charles Feit, as trustees, filed their account for the two trusts with the Supreme Court for the State of New York, Mario A. Procaccino and Joel I. Genzer as guardians ad litem for Richard Nidetch and David Nidetch, respectively, filed objections to the accounting. Hearings were then ordered before Special Referee Arthur N. Field to determine the trustees' liability, if any. Upon conclusion of these hearings, a settlement was achieved. The guardians' ad litem objections were withdrawn and the trustees were discharged from all liabilities incident to their trusteeship. The Supreme Court for the State of New York, County of New York, in December 1972 set the following fees for the proceedings to settle accounts and for leave of Manny Mark and Charles Feit to resign as trustees: Joel I. Genzer
$ 24,000
Mario A. Procaccino
24,000
Eisenberg & Weiss
(attorneys for Manny
Mark and Charles
Feit)
39,000
Arthur N. Field
(Referee)
14,000
Total
$ 101,000 The stipulation and *211 order embodying the settlement of the parties with respect to the proceeding for settlement of accounts and resignation of the trustees in which the fees were set provided as follows: Petitioners MANNY MARK and CHARLES FEIT, having brought on these Special Proceedings pursuant to Section 77 of the Civil Practice Law and Rules for the settlement of their accounts and for leave to resign as Trustees under Agreements dated January 2, 1966 for the benefit of RICHARD NIDETCH and DAVID NIDETCH, and MARIO A. PROCACCINO, ESQ., having appeared as Guardian Ad Litem for RICHARD NIDETCH, and JOEL I. GENZER, ESQ., having appeared as Guardian Ad Litem for DAVID NIDETCH, and pursuant to an order of this Court dated June 14, 1971, said Petitioners, to wit, MANNY MARK and CHARLES FEIT, were permitted to resign as Trustees of said Trusts and SANFORD E. MOORE, ESQ. was appointed as the Trustee of said Trusts, and the Guardians Ad Litem having filed objections to the account of the Petitioners and the Court having directed hearings to be held before Honorable ARTHUR N. FIELD, ESQ. as Special Referee to hear and report on the issue of the Petitioners' liability, if any, and hearings thereunder having *212 been held, and the parties having agreed upon a settlement of the subject Special Proceedings, it is hereby stipulated and agreed subject to the approval of the Court, by and between the Petitioners, their attorneys, the Guardians Ad Litem for the respective infants, the Settlor of the trusts, her attorney and the Court appointed Trustee as follows: * * *
SECOND: On or before December 31, 1972, one of the Settlors of the Trusts, JEAN NIDETCH, shall contribute an additional 1,550 shares of the common stock of Weight Watchers International, Inc. to each of the subject trusts. * * *
SEVENTH: That the indemnity agreement executed by JEAN NIDETCH, dated January 15, 1971, a copy of which is annexed hereto, be incorporated into and made a part of this order. In December of 1972 petitioner transmitted to Sanford E. Moore, as trustee of the trusts, 1,550 shares of Weight Watchers common stock for each of the trusts. The letter of transmittal stated: In accordance with my obligation under the Agreements dated June 25, 1970 (executed by Mortimer Nidetch and me and Charles Feit and Manny Mark), and in accordance with the Stipulation and Order of the Supreme Court of the State *213 of New York, New York County, dated December    , 1972, I do herewith deliver to you 1,550 shares of stock for each of the aforesaid trusts, together with stock assignments thereof. Subsequent to the change of trustees but prior to actually undertaking a proxy contest, the board of directors and petitioner agreed to settle their differences. They agreed upon the following: (1) Removal from the board of directors of two directors friendly to the management interest and replacement of those directors with new directors approved by petitioner; (2) a reduction of the responsibilities of members of the management group's family employed by the company; (3) a change in the company's publishing policy; (4) withdrawal by management of its proposed sale of mailing lists; (5) a long-term employment contract for petitioner at a higher salary along with the adoption of a more aggressive dividend policy; (6) abandonment of the pending merger with Bristol-Meyers; (7) guarantees that all information requested by board members would be supplied; and (8) a change in the company's attitude with respect to franchises and agreements regarding reconciliation. No proxy contest *214 was ever actually commenced. On her Federal income tax return for 1971 petitioner deducted $ 3,000 paid to Sanford E. Moore, successor trustee of the two trusts. Of this sum, only $ 1,100 is now in controversy. This sum is comprised of a payment on May 6, 1971, of $ 200 "for conference with guardians, etc." and a payment on October 14, 1971, of $ 900 "for a conference regarding children's trusts and a security and exchange review." On her Federal income tax return for 1972 petitioner deducted legal expenses of $ 102,500. This sum was comprised of the $ 101,000 set by the Court as fees which were paid by the trusts and $ 1,500 paid by petitioner on November 22, 1972, to the law firm of Schur, Rosenberg, Handler and Jaffin for legal services rendered to and on behalf of Manny Mark. The $ 101,000 paid by the trusts was not derived from the sale of the same 3,100 Weight Watchers shares that petitioner contributed to the trusts pursuant to her indemnification agreement. Petitioner's attorney addressed a letter to petitioner under date of December 22, 1972, in explanation of the Court's December 1972 order which stated in part as follows: You will recall I had indicated that *215 we would put in enough shares to equal $ 100,000. I fixed that amount at 3,100 shares at this particular point. * * * The Judge then made a quick calculation and decided that 3,100 shares was worth $ 101,000 and he thereupon cut each of the fees of the various parties by $ 1,000 so that it became: Procaccino
$ 24,000
Genzer
24,000
Eisenberg
39,000
Field
14,000
Total
$ 101,000 I indicated that we wanted to make the contribution this year for tax reasons. Sandy Moore, the trustee, indicated that for tax reasons for the trusts he prefers that 30% of the $ 101,000 be paid out in 1972, and 70% in 1973. He has sufficient cash on hand to pay $ 30,000 this year and he will do so. The balance would be paid in early January and he will have to sell some shares to produce the extra money. In his notice of deficiency respondent disallowed the claimed deductions for legal expenses on the grounds that petitioner had not established that she had incurred these legal expenses and that even if they were in fact incurred, it had not been established that the legal expenses were ordinary and necessary business expenses or were paid for the purposes designated in section *216 212. Petitioner contends that the expenses which she paid in 1971 and 1972 in connection with the proceeding to have the trustees of her sons' trusts resign and a substitute trustee appointed by the Court are deductible under either section 162(a) or section 212. Section 162(a) allows "as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." Petitioner argues that her positions as president and a director of Weight Watchers constitute a trade or business, that the legal expenses in dispute were incurred in this trade or business and are therefore proper deductions under section 162(a). Petitioner also argues that the expenses are deductible under section 212. This section provides, in pertinent part: SEC. 212. EXPENSES FOR PRODUCTION OF INCOME. In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year-- (1) for the production *217 or collection of income; (2) for the management, conservation, or maintenance of property held for the production of income; * * *
Petitioner contends that she paid the legal and related fees to improve corporate policy, in order to assure her retention of her salary from the corporation and also to increase the income productivity of her stock by way of increased dividends. On this basis petitioner claims that the expenses are properly deductible under section 212. Section 1.162-1(a), Income Tax Regs., provides that business expenses must be ordinary and necessary expenditures directly connected with or pertaining to the taxpayer's trade or business. Section 1.212-1(d), Income Tax Regs., similarly provides that for expenses to be deductible under section 212, they must bear a reasonable and proximate relationship to the production and collection of income. The requirements for deductibility under section 162(a) and section 212 are inparimateria with the one exception that under section 162(a), the income-producing *218 activity must qualify as a trade or business. United States v. Gilmore,372 U.S. 39, 45 (1963). Respondent contends that petitioner has failed to show the requisite proximate relationship between the legal expenses and her trade or business or her income-producing activities. [2]
*219 In Surasky v. United States,325 F.2d 191 (5th Cir. 1963), the taxpayer-appellant was a shareholder of Montgomery Ward and Co. He was not an officer, director or employee, and he did not aspire to any of these positions. Together with other shareholders, the taxpayer formed a committee whose purpose was to rebuild and reform Montgomery Ward, and to effectuate broad changes in company policy. The committee initiated a proxy campaign to elect a new majority of the board that was favorable to the committee's views. The taxpayer contributed $ 17,000 to the committee. Although the committee's efforts to secure a majority on the board of directors were not successful, many of the goals the committee sought were nevertheless attained after the board election. In holding that the taxpayer's $ 17,000 contribution was deductible under section 212, the court reasoned that in enacting section 212 "* * * Congress had in mind allowing deduction of expenses genuinely incurred in the exercise of reasonable business judgment in an effort to produce income that may fall far short of satisfying the common law definition of proximate cause." (325 F.2d at 195.) The *220 court observed that the payments were indisputably made in anticipation of increased profit to the taxpayer. In Central Foundry Co. v. Commissioner,49 T.C. 234 (1967), a Court reviewed case holding the amount paid by a corporation in reimbursement to the successful insurgents of their entire cost of a proxy contest to be deductible by the corporation under section 162, we stated at page 248: It is now settled law that costs incurred by a stockholder in a proxy contest may be deducted by him as "ordinary and necessary" expenses under section 212, at least to the extent that they are proximately related to the stockholder's incomeproducing activities. Graham v. Commissioner,326 F.2d 878, 880 (C.A. 4), reversing 40 T.C. 14; Surasky v. United States,325 F.2d 191 (C.A. 5). And the Internal Revenue Service has ruled that it will follow the decisions in these cases, if the expenditures "are proximately related to either the production or collection of income or to the management, conservation, or maintenance of property *221 held for the production of income." Rev. Rul. 64-236, 1964-2 C.B. 64. * * * [Footnote omitted.] Respondent in the instant case does not contend that the payments made by petitioner would not be deductible if they had been paid directly in a proxy contest, but attempts to distinguish between the expenses incurred in proxy contests and those at issue here. Respondent argues that proxy contest expenses are incurred to directly affect corporate policy whereas the expenses involved in this case were merely undertaken to put petitioner in the position to challenge corporate policy at some future date. In our view, the expenses petitioner incurred in the trustee substitution proceeding affect corporate policy in as direct a manner as do ordinary proxy expenses. In neither case does the expenditure itself directly affect corporate policy. Proxy expenses incurred to secure authorization to vote shares of stock merely put the initiating party in a position to affect corporate policy by use of the authority at some future date. Likewise, the expenses incurred in the trustee substitution proceeding put the petitioner in a position to have increased support on the board of *222 directors by having an additional 5 percent of the stock voted by persons favorable to her views. In our view, rather than being "one step removed" from a proxy fight, as respondent contends, under the stipulated facts in this case the expenses of the trustee substitution proceedings were a crucial first step in an anticipated proxy contest. Respondent suggests that a taxpayer wanting to change a trustee for personal reasons could try to make the expenses deductible by initiating the change at the time a proxy contest was contemplated. Whether the substitution of the trustee was undertaken for personal reasons rather than for the purpose of having the stock voted favorably to the taxpayer is a fact question. Here, respondent has stipulated the reasons for the substitution, so we have no such factual determination before us. The stipulated facts show that petitioner determined that the trustee substitution was a necessary first step to a reasonable chance of her success in a proxy contest. Respondent's position here effectively is that expenses of anticipated proxy fights are not deductible when a full-blown proxy contest is not undertaken because the parties reach a compromise *223 agreement on their own. In our view, this position is untenable. The preliminary steps taken in anticipation of a proxy fight pre-empted by settlement are incurred for the same purposes as those incurred in the initial stages of a dispute culminating in an actual proxy battle. To deny deductibility of the former while according deductibility to the latter would penalize those parties who are able to amicably settle their disputes. In sum, we conclude that by the substitution of trustees petitioner secured the voting support of a substantial block of Weight Watchers shares. This action strengthened her position in the event of a proxy contest and weakened the position of those who sought to interfere with her efforts to change corporate policy. In our view, the facts support the inference that the trustee substitution was a causative factor in the agreement in which petitioner's views were to a large extent adopted as corporate policy. An expense paid for such a purpose falls within the ambit of section 212(2) when it is incurred to conserve or protect the income-producing potential of a taxpayer's stock. Having concluded that such expenses are deductible under section 212, *224 we need not decide whether they are also deductible under section 162(a). We now turn to an examination of the specific expenses petitioner submits that she incurred as part of the trustee substitution proceedings. Respondent contends that the expenses of $ 1,100 for 1971, which consist of two payments to Sanford E. Moore, the substitute trustee, one in the amount of $ 200 and one in the amount of $ 900, have not been shown to be directly related to the trustee substitution proceeding. The evidence shows that the $ 200 payment was by check number 309, dated May 6, 1971, "for conference with guardians, etc." and the $ 900 payment was by check number 460, dated October 14, 1971, "for a conference regarding children's trusts and a security and exchange review." The record shows that Sanford E. Moore was appointed substitute trustee by order dated June 14, 1971. The record also shows that Moore was willing to be appointed substitute trustee only with the agreement that petitioner pay the expenses connected therewith. One conference with the guardians shortly before the court approved his appointment and a review of the trusts' assets shortly thereafter appear to be normal expenses *225 connected with his substitution. Since the substitution was for a purpose connected with petitioner's obtaining sufficient votes of shares to change the policies of Weight Watchers, these expenses were likewise for that purpose. We conclude that the $ 1,100 paid to Sanford E. Moore in 1971 is deductible under section 212. The amount of $ 101,000 represents the value of stock petitioner contributed to the trusts in 1972 to indemnify them for the cost of the substitution proceedings.The remaining $ 1,500 of the $ 102,500 in issue for 1972 consists of a fee paid by petitioner in 1972 to the law firm of Schur, Rosenburg, Hardler and Jaffin for services rendered in connection with the trustee substitution proceedings. The record contains a receipted bill from the law firm describing the services rendered and a letter showing payment of the $ 1,500 in 1972. We conclude that the expenditures of $ 102,500 in 1972 directly relate to the substitution proceedings and are therefore deductible under section 212. Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect in the years in issue.↩
*. The following handwritten notation appears in the righthand margin with reference to the $ 1,500 fee: increased by oral agreement to fee↩
2. Respondent on brief makes a statement that the $ 101,000 was not paid in 1972. The record indicates that the trusts did not pay the full amount to the various ultimate recipients in 1972. However, the stipulation states: In December 1972, the petitioner transmitted to Sanford E. Moore, as trustee for the trusts * * * 1,550 shares of stock in Weight Watchers International, Inc., for each of the individual trusts. These shares were transferred pursuant to the order of the Supreme Court for the State of New York * * *. The record therefore is clear that petitioner made the payment under her indemnification agreement in 1972. While the stipulation does not specifically state that the value of the 3,100 shares of stock was $ 101,000, the clear indication from the exhibits as well as the stipulation itself is that $ 101,000 was the value of the 3,100 shares of Weight Watchers stock when petitioner transferred those shares to the trusts. Respondent at no point contends that the value of these shares was not $ 101,000. Petitioner appears to be a cash basis taxpayer. If respondent by his statement on brief is contending that the $ 101,000 was not paid by petitioner in 1972, his contention is without merit.↩