O. WAYNE ROLLINS and GRACE W. ROLLINS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Rollins v. Commissioner
Docket No. 6480-77.
United States Tax Court
T.C. Memo 1979-331; 1979 Tax Ct. Memo LEXIS 197; 38 T.C.M. (CCH) 1274; T.C.M. (RIA) 79331; August 22, 1979, Filed Michael C. Russ,L. Joseph Loveland, and William F. Nelson, for the petitioners. Albert L. Sandlin, Jr., for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: Respondent determined a deficiency of $95,035 in petitioners' 1972 Federal income tax. The sole issue for decision is whether a $160,000 payment made to a trust, which was established by petitioner O. Wayne Rollins and his brother for the purpose of liquidating debts of businesses owned wholly or in part by their uncle, is deductible in full under sections 162(a)[1] or 212(2) or in part under section 166(d). [2]
*199 FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. O. Wayne Rollins (Wayne) and Grace W. Rollins, husband and wife, resided at Atlanta, Georgia, at the time of filing the petition herein. They filed a joint Federal income tax return for the year 1972 with the Internal Revenue Service Center, Chamblee, Georgia. On January 11, 1972, Wayne and his brother John Rollins (John) established a trust (the trust) for the stated purpose of paying the liabilities and thereby preventing the bankruptcy of three businesses owned wholly or in part by their uncle, Herschel E. Rollins, Sr., (Herschel). Wayne is the co-founder of Rollins, Inc., a Delaware corporation, whose common stock was listed on the New York Stock Exchange at all relevant times herein. At the time the trust was established, Wayne was president and chairman of the board of directors of Rollins, Inc., and owned approximately 39 percent of the company's total outstanding capital stock. As president, he oversaw the company's general operations and coordinated and arranged the *200 financing of numerous acquisitions. He reported a salary of $109,333 from Rollins, Inc., on his 1972 Federal tax return. On the date the trust was created, Rollins, Inc., stock closed on the New York Stock Exchange at a price of $47.75 per share, which price was approximately 47 times the earnings per share of the corporation for its fiscal year ending April 30, 1972. Wayne reported dividends of $709,113 from Rollins, Inc., on his 1972 Federal income tax return. Wayne was also a substantial shareholder of Rollins International, Inc. See p. 5, infra. Rollins, Inc., was founded in 1948 with an initial capitalization of approximately $37,500. By 1972, its gross revenues were approximately $150 million. It began by constructing radio stations and acquiring television stations and later acquired companies engaged in other types of businesses. The growth of Rollins, Inc., was achieved through a vigorous, highly leveraged acquisition program. For example, in 1964, when Rollins, Inc., had gross revenues of approximately $9 million and profits of approximately $900,000, it acquired Orkin Pest Control for $62.4 million in cash, of which all but $10 million was debt-financed. *201 Until approximately 1964, when the needs of Rollins, Inc., exceeded the amount that the Bank of Delaware could legally lend it, Rollins, Inc., had borrowed only from the Bank of Delaware. Thereafter, it continued to borrow from the Bank of Delaware when possible and used the Bank of Delaware as its principal reference when arranging financing with other institutions. In 1972, the Bank of Delaware was also a stock transfer agent for Rollins, Inc. In January 1972, John was chairman of the board, chief executive officer and the largest shareholder of Rollins International, Inc. (now RLC Corp.), a Delaware corporation, whose stock was at all relevant times herein listed on the American Stock Exchange. The principal office of Rollins Internationa, Inc., was located in Wilmington, Delaware, in January 1972. He was also a co-founder of Rollins, Inc., and owned approximately 8 percent of its outstanding stock at that time. In or about 1966, Herschel acquired from John a franchised American Motors dealership in Newark, Delaware, which was operated thereafter by Herschel through Newark Motors, Inc. (Newark Motors), a Delaware corporation of which Herschel was the sole shareholder. *202 At all relevant times prior to January 11, 1972, Herschel also owned one-half of the issued and outstanding capital stock of American Auto, Inc. (American Auto), a Delaware corporation, engaged principally in the business of selling used cars in Newark, Delaware, and a one-half interest in Circle Texaco, an entity engaged principally in the businesses of operating a Texaco service station and repairing and selling used automobiles. [3] The remaining outstanding stock of American Auto, Inc., and the remaining interest in Circle Texaco were owned by Arnold Lee Brown, an individual unrelated to petitioners, Herschel, or John. On September 15, 1970, Herschel, as president of Newark Motors, executed a demand note in the amount of $40,000 to the Bank of Delaware. Herschel, Herschel's wife, and Wayne, in that order and as individuals, endorsed the note. Wayne did this as an accommodation to his uncle and did not expect his own business to benefit from the loan or his endorsement of the note. The *203 note provided that the maker and endorsers each waived "presentment, demand and notice of dishonor." The Bank of Delaware never demanded payment from Wayne as an endorser. The note was fully paid by March 21, 1972. On June 24, 1971, Herschel, as president of Newark Motors, and the Bank of Delaware entered into a Floor Plan Security Agreement. Pursuant to this agreement, the Bank of Delaware agreed to, and did, advance funds to Newark Motors for the purpose of financing automobile inventory. Herschel and his wife personally guaranteed the payment of any liability arising under the floor plan financing agreement. Although Wayne and John were not in any way legally liable for Newark Motors' debts under the Floor Plan Financing Agreement, the Bank of Delaware would not have entered into the agreement with Newark Motors if Herschel had not been the uncle of Wayne and John, and it was understood that Wayne and John would not let the bank suffer a loss on its Floor Plan Financing Agreement with Herschel. With the possible exception of the accommodation endorsement by Wayne of Newark Motors' $40,000 note payable to the Bank of Delaware, Wayne was not liable or legally responsible *204 for the debts and liabilities of Herschel, Newark Motors, American Auto, or Circle Texaco. In or about the fall of 1971, John became concerned about the financial condition of Newark Motors, American Auto, and Circle Texaco because his uncle was in poor health and had asked on several occasions to borrow funds from him for the businesses. He asked Lawrence Barisa, an accountant employed by Rollins International, Inc., to examine the financial condition of the companies and report back to him. After an extensive examination, Mr. Barisa reported back that the companies were unable to pay their bills as they came due and that they needed approximately $130,000 cash to pay debts that were currently owing. Mr. Barisa also reported the following dishonest business practices: (a) Newark Motors had submitted false and altered financial statements to American Motors and the Bank of Delaware in order to secure financing, which statements had inflated the net worth of Newark Motors, which was in fact negative. (b) The companies had failed to account for or pay over a substantial amount of state and Federal taxes that were past due for periods dating back as far as 1969. (c) Automobiles *205 had been sold "out of trust," that is, without accounting for the funds to the financial institutions, including the Bank of Delaware, which had financed the initial purchase of the automobiles, under the Floor Plan Security Agreement, and held a security interest in the proceeds of sale. (d) Newark Motors and American Auto had a practice of double financing automobile inventory through the false sale of automobiles to employees. The companies had the use of money supposedly loaned to employee-purchasers while the companies made the employee-purchawers' monthly payments on their loans. On January 11, 1972, Wayne, John, and Herschel entered into an agreement, pursuant to which Wayne and John established a trust, the terms of which provided for the payment of the creditors of Newark Motors, American Auto, and Circle Texaco. Under the agreement, Herschel undertook not to receive any money, whether as compensation, return of investment or loans, or otherwise, from the three companies until the trust had been reimbursed for its expenditures and, upon request, to transfer to John and Wayne all of the stock of Newark Motors. The agreement stated that the trust was being established *206 because the three companies were insolvent and faced with the prospect of bankruptcy. During 1972, the trust received $364,953.46 and paid out $359,202.25 to liquidate the obligations of Herschel's three companies. The receipts included $160,000 from Wayne, $175,000 from John, of which $15,000 was repaid, and miscellaneous payments of amounts due to Newark Motors. The disbursements included a payment of $60,000 to Newark Motors which was used to repay loans of $30,000 each made by Wayne and John to Newark Motors in 1971. They also included payments of the balance due, including interest, on the $40,000 note endorsed by Wayne. See p. 7, supra. In 1973, the trust received $6,953.18 in payment of an American Motors warranty and from recovery of bad debts. Disbursements totaled $4,693.59. All disbursements were for the purpose of liquidating Herschel's businesses except for payments totaling $2,750.01 representing personal expenditures of Herschel for which the trustee obtained a demand note in favor of Newwork Motors, dated April 19, 1972, and signed by Herschel and his wife. The trust was terminated, effective April 15, 1974, and, on that date, the trustee paid $1,129.80 *207 to Wayne and $1,129.79 to John, closing out the trust's bank account. OPINION Petitioners contend that Wayne's payment of $160,000 to the trust is deductible either under section 212(2) as an expense incurred to conserve and maintain the value of Wayne's stock in Rollins, Inc., or under section 162(a) as an ordinary and necessary business expense incurred in order to protect and preserve his business reputation. In the alternative, they claim entitlement to a deduction for a non-business bad debt under section 166(d) with respect to that portion of the $160,000 which is allocable to payment of the note on which Wayne was liable as an endorser. Respondent argues that Wayne's payments to the trust were non-deductible personal expenses under the "origin of the claim" test enunciated in United States v. Gilmore,372 U.S. 39 (1963) or, alternatively, that the nexus between Herschel's business and Wayne and Rollins, Inc., is insufficient to meet the requirements of section 212(2) and 162(a). Respondent contends that petitioners are not entitled to a bad debt deduction with respect to any amount paid on the note that Wayne endorsed because he paid it voluntarily and *208 without legal obligation. For the reasons hereinafter stated, we hold for respondent. Respondent relies heavily on United States v. Gilmore,supra, where the Supreme Court held that "the origin and character of the claim with respect to which an expense was incurred, rather than its potential consequences upon the fortunes of the taxpayer, is the controlling basic test of whether the expense was "business" or "personal" and hence whether it is deductible or not * * *." 372 U.S. at 49. Respondent asserts that, since the claims paid by the trust originated in connection with Herschel's businesses and not in connection with Wayne's business, Wayne's payments are nondeductible personal expenses. Petitioners object to respondent's position on the ground that the "origin of the claim" test was formulated to deal with an entirely different factual situation, namely, the characterization as "business" or "personal" of legal expenses incurred in resisting a claim. We agree with petitioners that, in the absence of a claim against the taxpayer, the test enunciated in Gilmore is not directly helpful and we prefer to seek guidance instead from cases that *209 have decided in more similar factual contexts whether expenses incurred by a taxpayer are deductible. We hasten to add, however, that in so doing we do not imply that a hard-and-fast rule restricting the principle of Gilmore to situations where there exists a formal claim asserting legal liability against the taxpayer should be adopted. See pp. 23-24, infra.
Section 212(2) allows a deduction for all the ordinary and necessary expenses paid or incurred "for the management, conservation, or maintenance of property held for the production of income." In order to meet the requirement of section 212 that expenses be ordinary and necessary, petitioners must show that they bear a reasonable and proximate relationship to the conservation of property. Trust of Bingham v. Commissioner,325 U.S. 365, 370 (1945); Surasky v. United States,325 F.2d 191, 194 (5th Cir. 1963); section 1.212-1(d), Income Tax Regs. They are not required to show that, in the absence of Wayne's payments to the trust, the value of his stock in Rollins, Inc. *210 , would in fact have declined but they must show that there was a reasonable basis for his belief that this would happen. [4] See Surasky v. United States,supra at 194-195; Mitchell v. Commissioner,52 T.C. 170, 176 (1969), reversed on other grounds, 428 F.2d 259 (6th Cir. 1970). *211 Wayne claims that if he and John had not paid the debts of Herschel's companies, the businesses would have been forced into bankruptcy and their dishonest business practices would have been revealed. The Rollins name would then have been associated with bankruptcy and scandal and this might have affected the value of his Rollins, Inc., stock. The crux of petitioner's argument is that the investing public does not distinguish one member of the Rollins family from another and that, consequently, adverse publicity about one affects the others. Although there is some evidence in the record that people have confused Wayne with John, there is no evidence that anyone has confused them with Herschel and we do not think it may be inferred from the confusion regarding Wayne and John that such confusion was likely with respect to Herschel. Wayne and John are brothers, lifelong business associates, and co-founders of Rollins, Inc. Wayne was president, chairman of the board and controlling stockholder of Rollins, Inc., whose stock was publicly traded and in which John owned a substantial block of stock and of which John was a director; John was chairman of the board, chief executive officer *212 and controlling stockholder of Rollins International, Inc. (now RLC Corp.), whose stock was also publicly traded and in which Wayne owned a substantial block of stock. We do not doubt that confusion might well have resulted from this situation. But Wayne's relationship with his uncle is a different story. He had no business associations with Herschel and Herschel's companies did not bear the Rollins name. Moreover, Herschel's businesses were small local closely-held operations while the stock of Rollins, Inc., was traded on the New York Stock Exchange. We appreciate the fickleness of the stock market, particularly with respect to stocks that have a high-price-earnings ratio. But, we think that the relationship between the financial woes and dishonest practices of Herschel's companies and the value of Rollins, Inc., stock on the New York Stock Exchange is far too tenuous to justify a deduction under section 212(2). [5]
*213 The cases upon which petitioners rely concern parent-subsidiary situations where the relationship between the parent company which paid the debts and the subsidiary company which incurred the debt was far closer than in this case. [6] In Scruggs-Vandervoort-Barney, Inc. v. Commissioner,7 T.C. 779 (1946), the two companies had similar names, the same location and many common customers. Similarly, in L. Heller & Son, Inc. v. Commissioner,12 T.C. 1109 (1949), the companies had similar names, businesses, and creditors. Petitioners also seek to draw sustenance from Surasky v. United States,325 F.2d 191 (5th Cir. 1963), where the court allowed a deduction under section 212(2) for amounts expended by a shareholder in an effort undertaken with other shareholders to elect new directors with the hope of changing the company's policies and increasing the value of their investments. *214 The Court of Appeals rejected the District Court's conclusion that such payments were too speculative. Surasky, however, does not give taxpayers a license to deduct any expenses that are remotely related to their investments, no matter how indirect and convoluted the relationship may be. The Court in Surasky framed the test, as we have, in terms of whether the expenses were incurred in the exercise of reasonable business judgment, a test which we have found petitioners failed to pass.
Section 162(a) allows a deduction for all ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business. Petitioners claim that Wayne's payment to the trust is deductible as an expense of his trade or business of being a corporate officer under a line of cases that have allowed deductions for payments made to protect an established business reputation. E.g., Milbank v. Commissioner,51 T.C. 805 (1969); Miller v. Commissioner,37 B.T.A. 830 (1938). They advance two independent theories, both of which are premised on the *215 importance of Wayne's reputation to his ability to perform his job, particularly with respect to arranging financing for corporate acquisitions. First, they argue that the disclosure of the insolvency and dishonest practices of Herschel's businesses would have generated adverse publicity which would have affected Wayne's general business reputation. Second, with respect to debts owed by Herschel's businesses to the Bank of Delaware, they argue that it was understood that John and Wayne would not let the bank suffer a loss, and Wayne's reputation with the Bank of Delaware in particular and the financial community in general would have been severely harmed if he had refused to pay Herschel's debts because he was not legally liable. We think that the relationship between Herschel's businesses and Wayne's business reputation is far too indirect to bring petitioners' case within the parameters of those cases that have allowed deductions for expenditures incurred for the preservation of business reputation. In one group of cases, the taxpayer, in the course of his business, recommended investments to others and then incurred expenses to save those persons from suffering large losses on *216 their investments. Milbank v. Commissioner,supra;Pepper v. Commissioner,36 T.C. 886 (1961); Miller v. Commissioner, supra.In another group of cases, the taxpayer paid the debts of a business that was technically a separate entity but for which the taxpayer was considered responsible because the proprietary interests in both businesses were identical or almost identical. [7]Allen v. Commissioner,283 F.2d 785 (7th Cir. 1960), affg. in part and revg. in part T.C. Memo. 1959-227; L. Heller & Son, Inc. v. Commissioner,supra; Scruggs-Vandervoort-Barney, Inc. v. Commissioner,7 T. C. 779 (1946). In A. Harris & Co. v. Lucas,48 F.2d 187 (5th Cir. 1931), the taxpayer had been relieved of the obligation to pay its debts in a creditors' compromise but made payment in order to restore its credit rating. All of these cases concern situations where the impact of the payment on the fortunes of the taxpayer's business was direct. *217 On the other hand, where the relationship between an expenditure and the taxpayer's business is too indirect, the expenditure is not deductible. See Bonney v. Commissioner,247 F.2d 237 (2d Cir. 1957), affg. 24 T.C. 199 (1955) (payment to silence derogatory accusations); Friedman v. Delaney,171 F.2d 269 (1st Cir. 1948) (payment of moral obligation arising from lawyer's assurances that money would be available from his bankrupt client); Spears v. United States, an unreported case ( E.D. Tex. 1973, 32 AFTR 2d 73-5519, 73-2 USTC par. 9621), (payment of obligations of corporations in which taxpayer was a stockholder, in order to preserve his reputation as a banker). We think that petitioners' case falls within this category. Although we do not consider United States v. Gilmore,supra, as having a direct bearing on our decision herein (see pp. 13-14, supra), we think it is at least arguable that the "origin of the claim" doctrine articulated by the Supreme Court has a potential application to the *218 circumstances of this case. We have found that it was understood between Wayne and John, on the one hand, and the Bank of Delaware, on the other, that they would not let the bank suffer a loss on loans to Herschel (see pp. 7-8, supra). It is clear, however, that with the exception of the $40,000 note endorsed by Wayne, no legal obligation to the bank was involved. Nevertheless, we think that the understanding with the bank can be viewed as giving rise to a moral obligation. Granted that a moral obligation may, under certain circumstances, support a deduction of amounts voluntarily paid (Milbank v. Commissioner, supra at 718; Pepper v. Commissioner,supra at 895), we think it may be said that the family relationship was a significant generating factor underpinning such understanding as may have existed and the use of Wayne's funds to cover Herschel's indebtedness to the bank. At least, petitioners have not convinced us that such was not the case. [8] In this context and given the fact that Wayne had not business association whatsoever with Herschel, the "origin" of this "obligation" to the bank would be personal and the payments nondeductible under *219 the reasoning of Gilmore. Our views as to the possible application of Gilmore are not intended to encompass the principle that the existence of a family relationship necessarily precludes a deduction in situations such as are involved herein but rather simply to indicate that the presence of such a relationship is inevitably an element affecting the evaluation of the evidence presented. In our analysis of the application of sections 162 and 212, we have been fully aware of two general observations of the Supreme Court in a situation such as is involved herein where our task requires placing a particular case on one side of a line or the other, based upon an analysis of all the facts and the reasonable inferences to be drawn therefrom. One observation is set forth in Welch v. Helvering,290 U.S. 111, 114-115 (1933): Here, indeed, as so often in other branches of the law, the decisive distinctions are those of degree and not of kind. One struggles in vain for any verbal formula that will supply a ready touchstone. *220 The standard set up by the statute [a predecessor of section 162] is not a rule of law; it is rather a way of life. Life in all its fullness must supply the answer to the riddle. The other observation is found in Commissioner v. Duberstein,363 U.S. 278 (1960), where the Supreme Court pointed out, in a case involving the issue of gift versus compensation, that the decision "must be based ultimately on the application of the fact-finding tribunal's experience with the mainsprings of human conduct to the totality of the facts of each case." See 363 U.S. at 289. Given the fact that the burden of proof is on the petitioners ( Welch v. Helvering,supra; Rule 142(a), Tax Court Rules of Practice and Procedure), our evaluation of the interrelationship of the elements of business, investment and family considerations reflected in the record herein and our weighing of the evidence (including the testimony of the witnesses whom we saw and heard), leads us to conclude that petitioners have failed to convince us that Wayne's expenditures on behalf of Herschel's businesses meet the standard of "ordinary and necessary expenses" contained *221 in sections 162(a) and 212. Finally, we hold that petitioners are not entitled to a non-business bad debt deduction under section 166(d) for the amount allocable to payment of the note to the Bank of Delaware that Wayne endorsed.[9] Wayne was at most an accommodation endorser along with Herschel and his wife and the terms of the note waived "presentment, demand and notice of dishonor." Under these circumstances and given the conditions under which the trust was set up and operated, we think it immaterial that the Bank of Delaware did not make a demand for payment from Newark Motors, the primary obligor. Thus, we see no purpose to be served in analyzing whether the payments on the note technically fall outside the ambit of payment on a guaranty. See Siple v. Commissioner,54 T.C. 1 (1970); Cf. Santa Anita Consolidated, Inc. v. Commissioner,50 T.C. 536 (1968); Shea v. Commissioner,36 T.C. 577 (1961), affd. per curiam 327 F.2d 1002 (5th Cir. 1964). Assuming that such payments were not considered payments on a guaranty, our previous analysis would preclude deductibility. On the other hand, if such payments are *222 considered as having been made pursuant to a guaranty, Wayne would have had a claim over against Newark Motors for the full amount and a right of contribution from Herschel and his wife to the extent that Newark Motors did not reimburse him. See Del. code, Ann. tit. 5A, secs. 3-414, 3-415 (1871). Such a claim would be considered a debt for purposes of section 166(d) and a deduction would be allowable only to the extent that petitioners were able to prove that they became worthless in the taxable year before us. Putnam v. Commissioner,352 U.S. 82 (1956); Ritter v. Commissioner,163 F.2d 1019 (6th Cir. 1947), affg. per curiam a Memorandum Opinion of this Court dated October 9, 1946; Estate of Pachella v. Commissioner,37 T.C. 347, 354 (1961), affd. 310 F.2d 815 (3d Cir. 1962). The record does not establish that Wayne could not have recovered the payment and, thus, it has not been established that the debt was worthless. While the record shows that Newark Motors was unable to pay its debts as they came due, it does not show that no recovery at all was possible. With respect to the financial position of Herschel *223 and his wife, the record contains only a few vague references which are not sufficient to establish whether they were capable of repaying Wayne. Accordingly, petitioners are not entitled to a deduction under section 166(d). See Estate of Pachella v. Commissioner,supra at 353, 355. Having decided that petitioners are not entitled to any deduction under sections 212, 162, or 166, we need not determine whether the time and amount of any deduction, if allowable, would be determined by reference to the time and amount of Wayne's payment to the trust or by the time and amount of distributions from the trust. We also do not reach the question of whether Wayne's payment constitutes a capital contribution to Rollins, Inc., or to Herschel's businesses since petitioners do not claim entitlement to such treatment. Nor need we, in light of our analysis, consider *224 petitioners' alternative claim, made in the vaguest of terms on brief, that the payments to the trust might be viewed as payments for the acquisition of Herschel's interests in the three businesses involved and that, on this basis, petitioners would be entitled to a deduction for worthless securities under section 165(g). We note, in this connection, that the evidence of record is woefully inadequate to carry petitioners' burden of proof as to their right to claim a capital loss in this context. Decision will be entered for respondent. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable year in issue. ↩
2. In their petitioner, petitioners also claimed entitlement to a loss under section 165 and to reimbursement for attorneys' fees. They have made no reference to these arguments on brief and we assume they have abandoned them. In any event, irrespective of our decision herein, they would not be entitled to attorneys' fees. Key Buick Co. v. Commissioner, 68 T.C. 178↩ (1977), on appeal (5th Cir. Aug. 15, 1977).
3. Circle Texaco filed its final Federal tax return on Form 1065, U.S. Partnership Return of Income. However, petitioners sometimes referred to Circle Texaco as a de facto corporation.↩
4. As a general rule, a payment made by a shareholder for the benefit of his corporation is not deductible under sections 212 or 162 even though the payment may reasonably be expected to increase the value of the shareholder's stock. Deputy v. duPont,308 U.S. 488 (1940); Hewett v. Commissioner,47 T.C. 483 (1967). Petitioners' argument under section 212, however, seems to be based on the assumption that the profitability of Rollins, Inc., would not be affected but that the value of Rollins, Inc., stock would be affected. Considering the high-price-earnings ratio at which the stock was selling, this approach has some merit. When the facts are viewed in this light, the payments arguably are not for the benefit of Rollins, Inc., and not within the rule of Deputy v. duPont,supra↩.In view of our disposition of the issue, we need not resolve this question.
5. In so stating, we recognize that petitioners offered the testimony of one witness, whose investment banking house ws actively involved in the trading of Rollins, Inc., stock in 1972 and whom respondent accepted as an expert in respect of the market for Rollins, Inc., stock in 1972. He testified that "any headlines in the newspaper relating to the Rollins name * * * could↩ have had a depressing or a detrimental effect on the stock" and that he would, if asked, have advised Wayne that money "would have been well spent" to avoid the publicity attendant upon "the bankruptcy of an uncle and three businesses owned by the uncle" (emphasis added). Not only was his advice not sought at the time, although it would have been logical for Wayne to have done so, but his testimony was conched in terms of possibility rather than probability and, in our opinion, is insufficient in light of the other evidence of record to provide the necessary "reasonable basis" for Wayne's decision to help his uncle out of financial difficulty.
6. These cases arose under section 162. However, since sections 162 and 212 are to be read in para materia, Trust of Bingham v. Commissioner,325 U.S. 365, 373 (1945), the reasoning under section 162↩ is applicable to the issue herein.
7. See also Conley v. Commissioner,T.C. Memo. 1977-406; Conti v. Commissioner,T.C. Memo. 1972-89↩.
8. We doubt that Wayne would have displayed the same attitude or taken the same action if Herschel had not been so closely related to him.↩
9. Since only one-half the amount paid on the note is attributable to Wayne because John made an equal contribution to the trust, petitioners' deduction would, in any event, be correspondingly limited and petitioners do not contend otherwise insofar as the applicability of section 166(d)↩ is concerned.